**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
David M. Bass, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for RCLC, Inc., *et al.*,
Debtors-in-Possession

|  |  |
|---|---|
|  | UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY CASE NOS. 10-35313, 10-35315, 10-35318 |

In re:

RCLC f/k/a Ronson Corporation, *et al.*,

        Debtors-in-Possession.

Chapter 11
(Joint Administration Requested)

**VERIFIED APPLICATION IN SUPPORT OF THE DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363 AND 364, RULES 2002, 4001, AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, AND THE COURT'S GENERAL ORDER ADOPTING GUIDELINES FOR FINANCING REQUESTS:  (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING ON SUPERPRIORITY AND SECURED BASIS, (II) PERMITTING THE USE OF CASH COLLATERAL, (III) GRANTING INTERIM RELIEF, AND (IV) SCHEDULING A FINAL HEARING UNDER BANKRUPTCY RULE 4001(C)**

**HEARING DATE AND TIME:**
August __, 2010, at __:__ __.m.

**ORAL ARGUMENT REQUESTED**

TO:    Honorable Michael B. Kaplan
        United States Bankruptcy Judge

RCLC, Inc. f/k/a Ronson Corporation ("RCLC" or "Parent", as applicable) Ronson

Aviation, Inc. ("Ronson Aviation" or "RAI," as applicable) and RCPC Liquidating Corp. f/k/a

Ronson Consumer Products Corporation ("Consumer Products"), as debtors and debtors-in-

possession herein (collectively, the "Company" or the "Debtors") hereby submit this motion (the

"Motion") pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 and Rules 2002, 4001 and

9014 of the Federal Rules of Bankruptcy Procedure for entry of an interim order (the "Interim

Financing Order")[1] and a final order (the "Final Financing Order"): (i) approving postpetition

financing, (ii) authorizing use of cash collateral, (iii) granting liens and providing superpriority

administrative expense status, (iv) granting adequate protection, (v) modifying the automatic stay

and (vi) scheduling a final hearing (the "Final Hearing").  In support of this Motion, the Debtors

submit the Affidavit of Daryl K. Holcomb in Support of the Debtors' Various "First Day"

Motions" and Entry of an Emergency Interim Order Authorizing Payment of Certain Pre-Petition

Payroll and Related Obligations Pending Hearing on "First Day" Motions (the "Holcomb

Affidavit")[2] filed contemporaneously herewith.  In further support of this Motion, the Debtors

respectfully state as follows:

## I.    INTRODUCTION

1.      On the date hereof (the "Filing Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

"Bankruptcy Code"), together with various motions and applications seeking certain typical

"first day" orders.

---

[1] A copy of the proposed Interim Financing Order is attached hereto as **Exhibit A**.

[2] Capitalized terms not otherwise defined herein shall be given the meaning ascribed to them in the Holcomb Affidavit.

2.       The Debtors continue in possession of their properties and continue to operate and manage their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.       No request has been made for the appointment of a trustee or examiner, and no official committee(s) has been appointed in these cases.

4.       This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of the Debtors' Chapter 11 cases and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2).

5.       The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363, 364 and 507 of the Bankruptcy Code and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## BACKGROUND

**A.       Overview of the Debtors' Businesses**

6.       RCLC is a New Jersey corporation incorporated in 1928.  Prior to March 2, 2009, RCLC's shares of common stock were listed on the NASDAQ Capital Market and quoted under the symbol RONC.  Effective March 2, 2009, RCLC's shares of common stock are traded on the Over-the-Counter Pink Sheets and quoted under the symbol RONC.PK.

7.       RCLC is a holding company and does not conduct business operations except through its subsidiary entities.  Consumer Products and Ronson Aviation are each wholly-owned subsidiaries of RCLC.  Consumer Products and Ronson Aviation are each a New Jersey corporation.

8.       Historically, the Company has been engaged principally in the following businesses: (i) consumer products and (ii) aviation-fixed wing and helicopter services.

3

9.     In 2009, the Debtors determined, with the advice of their various professionals and their Chief Restructuring Officer, that sales of the respective business units was in the best interests of the Company and its stakeholders.  In that regard, and with shareholder approval obtained through a proxy and solicitation, the Company embarked on sale transactions, and entered into separate asset purchase agreements, for the respective sales of its consumer products business and its Fixed Base Operator ("FBO") operations.  While the consumer products sale transaction closed without delay, certain issues relating to the proposed purchaser's financing delayed, and ultimately thwarted, a closing on the sale of Ronson Aviation's assets to that proposed purchaser.

10.     Thus, following the sale of its consumer products business in February 2010, the Company's operations became limited to Ronson Aviation's aviation-fixed wing and helicopter services (FBO) at Trenton-Mercer County Airport, which remain operational to date.  That notwithstanding, the liquidity constraints facing the Company, and its obligation in its forbearance agreement with Wells Fargo to pursue a "Liquidity Transaction", compelled the Debtors to pursue other purchasers for the Ronson Aviation business.

11.     The Debtors engaged the services of an investment banker, SSG Capital Advisors LLC, to assist them in that regard, and have located a potential stalking horse purchaser, with whom the Debtors are negotiating the form of an asset purchase agreement.

12.     Faced, however, with concerns about the ability of the Debtors to continue to fund working capital needs, and so as to preserve the value of the Debtors' remaining assets, the Debtors concluded that a Chapter 11 filing designed to facilitate a sale of substantially all of the Debtors' remaining assets, including those utilized in the business operations of Ronson Aviation, to a purchaser (the "Sale") pursuant to a section 363 sale was the most efficient manner

in which to consummate the Sale and was, therefore, in the best interests of the Debtors, their

creditors, and all other parties involved.  The Debtors also grew concerned that since the

Company is publically traded, and since the shareholder approval obtained approved the sale of

Ronson Aviation only to a specified purchaser on specific terms, a sale to a different purchaser

outside of bankruptcy would require the filing of a new proxy statement and the renewed

solicitation of shareholder approval.  The cost to obtain the initial shareholder approval of the

two prior sales (sought by a single proxy) exceeded $270,000.00 and took approximately

eighteen (18) weeks to complete.  Under RCLC's by-laws , shareholder approval requires that in

excess of 50% of all shareholders vote.  The cost, time-delay and prospect that a sufficient

number of shareholders might not cast ballots led the Board to conclude that a 363 sale was a

less costly method and more efficient than once again soliciting shareholder approval.

13.     A more detailed description of the Company's business, background, capital and

debt structure, and the circumstances leading to the Chapter 11 filings is included in the

Holcomb Affidavit, which is incorporated herein by reference.

**B.     The Debtors' Pre-Petition Debt Structure**

- ***The Prepetition Credit Facility with Wells Fargo***

14.     The Debtors and non-debtor RCC are parties to a pre-Filing Date senior secured

financing facility (the "Prepetition Credit Facility") with Wells Fargo Bank, National

Association ("Wells Fargo"), acting through its Wells Fargo Business Credit operating division,

governed by the terms of a Credit and Security Agreement dated as of May 30, 2008 (as

amended, modified, supplemented or restated from time to time, the "Credit Agreement").  As

executed, the Prepetition Credit Facility consisted of (a) a revolving credit facility in an amount

up to $4.0 million (the "Revolving Credit Facility"), and (b) the following term loans: (i) an

46726/0001-6921267v1

Equipment Term Advance in the original principal amount of $837,500; and (ii) a Real Estate

Term Advance in the original principal amount of $2,922,500.  Consumer Products, Ronson

Aviation and non-debtor, RCC, are the "Borrowers" under the Prepetition Credit Facility and

RCLC is a guarantor.

15.     Amounts advanced under the Prepetition Credit Facility are secured by

substantially all of the assets of the Company and its subsidiaries.[3]

16.     Borrowings under the Revolving Credit Facility are subject to a borrowing base

tied to the Company's eligible inventory and accounts receivable, and other factors, as set forth

in the Credit Agreement.

17.     Under the terms of the Credit Agreement, the term of the Prepetition Credit

Facility was 60 months.  The Prepetition Credit Facility provides for LIBOR Advances (except

during a Default Period, as such term is defined in the Credit Agreement) and Floating Rate

Advances (as such term is defined in the Credit Agreement), payable at such interest rates and at

such times as are provided for in the Credit Agreement, and contains minimum tangible net

worth, minimum net income, minimum net cash flow and other financial covenants, certain

restrictions on capital expenditures, as well as affirmative and negative covenants and events of

default typical of transactions of that nature.

18.     On or around May 30, 2008, the Company applied a portion of the proceeds of the

Prepetition Credit Facility to pay off its prior credit facility with CIT Group/Commercial

Services, Inc., as well as to pay off other debt outstanding to EPIC Aviation, LLC, Bank of the

West, and Banc of America Leasing.

---

[3] Under the terms of the Credit Agreement, Wells Fargo did not have a lien or security
interest in either the real property owned by Consumer Products in Woodbridge, New Jersey,
which has since been sold, or 34% of the Company's interest in RCC.

- ***Defaults Under the Prepetition Credit Facility and the Forbearance Agreement***

19.    On November 21, 2008, Wells Fargo advised the Company and its subsidiaries that "Events of Default" under the Credit Agreement had occurred.  These events of default included the Company's failure to meet financial covenants as follows: (a) the minimum Tangible Net Worth as of September 30, 2008, (b) the minimum Net Income for the nine months ended September 30, 2008, and (c) the minimum Net Cash Flow for the nine months ended September 30, 2008, and the Company's failure to meet all of the requirements of the Post-Closing Agreement dated May 30, 2008.  As a result of the Events of Default, Wells Fargo exercised certain of the rights available to it under the Credit Agreement, including increasing the interest rate charged on the loans outstanding under the credit agreement by 3% retroactive to July 1, 2008, the date of the occurrence of the Events of Default.  In addition, in November and December, Wells Fargo exercised certain additional rights available to it under the Credit Agreement as a result of the Events of Default and reduced the amounts available to be borrowed under the revolving line of credit.  In December 2008, Wells Fargo required that the Company engage a consultant to review and monitor the Company's operation and Wells Fargo increased its monitoring of the line of credit.

20.    In December 2008, in response to suggestions from Wells Fargo, the Company's Board of Directors began interviewing financial consultants to assist the Company in managing its operations and cash requirements.  On January 6, 2009, the Company engaged Getzler Henrich & Associates LLC ("Getzler Henrich") as its financial consultant.  Getzler Henrich is a corporate turnaround and restructuring firm which, in addition to its operational restructuring focus, is experienced in restructuring, lender/creditor relationship management and financing.

21.     On February 20, 2009, the Company received from Wells Fargo an additional notification of Wells Fargo's reservation of rights and remedies relating to the previously identified Events of Default.  The notification further indicated that Wells Fargo acting in accordance with the Credit Agreement to was instituting certain restrictions and reduce loan availability.

22.     On March 30, 2009, Wells Fargo entered into a forbearance agreement with the Company under which Wells Fargo agreed not to exercise any of its additional rights and remedies available as a result of the Events of Default under the Credit Agreement through April 24, 2009, unless earlier terminated in the event the Company, among other things, breached the forbearance agreement.  Wells Fargo also agreed to provide the Company with an overadvance facility (i.e., the Accommodation Overadvance) in the amount of $500,000 to supplement the Company's credit line and enhance its liquidity, which bears interest at 8% over prime.  The forbearance agreement was subsequently amended on numerous occasions to provide, in each case, extensions of the forbearance period and, in some cases, for additional credit availability (the original agreement together with all amendments, collectively, the "Forbearance Agreement").  The last amendment to the Forbearance Agreement, the Twenty-First Amendment to Forbearance Agreement (the "Twenty-First Forbearance Amendment"), was executed as of August 10, 2010, and extended the forbearance period through August 16, 2010.

23.     In connection with the Forbearance Agreement, the Company agreed, among other things, to actively pursue a "Liquidity Transaction".[4]

---

[4] A Liquidity Transaction is defined in the Forbearance Agreement as follows:

> [A transaction where] Parent and the stockholders of Parent are actively pursuing either a sale of all of the capital stock of RAI or of all or substantially all of the assets of RAI or financing to be provided by another lender (each a "Liquidity Transaction"), in

8

24. Without regard to the amounts to be restored to the Custodial Account (as described more fully in the Holcomb Affidavit), as of the Filing Date, outstanding principal obligations under the Prepetition Credit Facility total approximately $3.62 million, plus such amounts as may have accrued for interest and other fees and expenses as of the Filing Date.[5]

- ***The Engagement of Getzler Henrich & Associates LLC, as Chief Restructuring Officer***

25. On March 30, 2009, as a condition to the Forbearance Agreement, the Company retained Joel Getzler, of Getzler Henrich, as Chief Restructuring Officer, pursuant to the terms of an agreement with Getzler Henrich entered into on March 30, 2009, which supplemented the Company's earlier consulting agreement with Getzler Henrich (collectively, the "Getzler Henrich Engagement Agreement"). In accordance with the Getzler Henrich Engagement Agreement, Joel Getzler, as Chief Restructuring Officer, was charged with responsibility for the Company's operations, finance, accounting and related administrative issues, subject to the authority of and reporting to the Company's Board of Directors.

26. In accordance with the agreement of the parties, as set forth in, among other documents, the Getzler Henrich Engagement Agreement, the Company is obligated for fees and expenses to Getzler Henrich in connection with services provided by Mr. Getzler and his associates. In addition, Getzler Henrich is entitled to a signing bonus in the amount of $200,000.

---

either case in an amount sufficient to enable the Obligors to fully
pay and satisfy the Indebtedness …

[5] Without regard to the amounts to be restored to the Custodial Account, as of the Filing Date, the amounts due under the Prepetition Credit Facility are comprised of the following: (i) net advances under the Revolving Credit Facility and amounts necessary to satisfy the Accommodation Overadvance totaling $2,466,926.84; and (ii) principal and interest of $1,153,639.70 on account of the Real Estate Term Advance. (The Equipment Term Note was repaid from the proceeds of the Zippo Sale and a portion of the Real Estate Term Note was repaid consistent with the Thirteenth Forbearance Amendment, as described below).

27.    Mr. Getzler and associates of Getzler Henrich have been involved with the Company on a virtual full-time basis since March 30, 2009.

28.    During the term of the Engagement Agreement, payments against accrued amounts, including the signing bonus, have been made to Getzler Henrich in the amount of $10,000 each week.  All accrued amounts, together with the amount of $190,000 owed to Getzler Henrich in fees prior to the appointment of Mr. Getzler as Chief Restructuring Officer, will become due upon specified liquidity events, or earlier if the Company is not in compliance under the Engagement Agreement.  The Aviation Sale will necessitate the payment of all accrued fees to Getzler Henrich.  A payment of $100,000 was made to Getzler Henrich from the proceeds of the sale of the consumer products business on February 2, 2010.

29.    All amounts owed to Getzler Henrich are secured by a collateral interest in those assets pledged to Wells Fargo, subordinated to the interest of Wells Fargo pursuant to that certain Agreement, dated as of March 30, 2009, by Getzler Henrich for the benefit of Wells Fargo (the "Subordination Agreement").  During the term of the Engagement Agreement, payment of salaries, fees, perks and expenses to members of the Company's Board of Directors, including those directors who also serve as officers of the Company, have been deferred.

30.    The Getzler Henrich Engagement Agreement expired upon the commencement of these Chapter 11 cases.

31.    As of the Filing Date, the Company was indebted to Getzler Henrich in the amount of approximately $2,001,000.00.

### C.    Other Debt Obligations

32.    As of the Filing Date, the Company had other current and long-term debt in the aggregate amount of approximately $1.133 million, and certain other equipment loans aggregating approximately $8,000.00.

33.    In addition, the Debtors estimate that they have approximately $4.185 million of unsecured trade debt and other operating expenses.  Of those amounts, the unsecured trade debt and other operating expenses are attributable to RCLC, Ronson Aviation and Consumer Products in the following estimated amounts: $2.052 million, $.639 million and $1.494 million, respectively.  These unsecured obligations are in addition to the PBGC Claim (as described in the Holcomb Affidavit) in the amount of $4.410 million, for which the Debtors are jointly and severally liable.

### D.    The Debtors' Need for Postpetition Financing

34.    On May 11, 2010, the Company engaged SSG Capital Advisors LLC ("SSG"), an investment banking firm, to assist them in marketing Ronson Aviation's business and soliciting bids for a sale.  During ensuing weeks, SSG identified and contacted the top industry constituents who would be in a position to move quickly.[6]  SSG contacted ten (10) potential strategic and financial buyers.  Concurrently, management contacted a significant number of additional potential strategic and financial buyers known to it.  Of those parties, ten (10)

---

[6]Given that a sale process was previously underway prior to SSG's engagement, as outlined in the Holcomb Affidavit, and as a result of the failure of that sale process to result in consummated transaction with Hawthorne, SSG immediately began its marketing process to financial and strategic buyers familiar with Ronson Aviation's assets and operations in order to quickly identify a potential buyer that could issue a Letter of Intent and minimize further delay in closing a sale of Ronson Aviation's assets.  Due to the need to quickly identify a potential buyer, SSG approached the likely candidates that could move to issue a Letter of Intent and work towards signing a definitive Asset Purchase Agreement.  The decision to engage a limited number of potential buyer candidates was necessitated by the Debtors' liquidity restrictions, and was supported by Wells Fargo.

executed confidentiality agreements, received the information memorandum and gained access

to a financial, operational and environmental due diligence managed by SSG and management.

Thereafter, two (2) potential buyers received management presentations or conducted facility

tours.

35.    After several rounds of bidding and negotiations with various interested parties,

the Debtors, in consultation with their professionals, selected Ross Aviation, Inc., through a

newly formed single-purpose entity (the "Ross Aviation Buyer"), to serve as a stalking horse

purchaser of substantially all of Ronson Aviation's assets, subject to the negotiation and

execution of an asset purchase agreement.  RCLC and Ronson Aviation have entered into an

exclusive letter of intent (the "LOI"), which forms the basis for the Ross Aviation Buyer's

potential stalking horse bid for substantially all of Ronson Aviation's assets pursuant to section

363 of the Bankruptcy Code.  Under the terms of the LOI, RCLC and Ronson Aviation have

agreed to sell substantially all of Ronson Aviation's assets to the Ross Aviation Buyer for $9.4

million, subject to certain adjustments and the assumption of certain limited liabilities, including

what the Debtors' estimate will be all current ordinary course trade obligations of Ronson

Aviation and certain accrued obligations to Ronson Aviation's employees.

36.    Although the Debtors expect to consummate a sale to the Ross Aviation Buyer (or

a buyer with a higher or better offer) in short order, the Debtors do not have sufficient sources of

working capital, including cash collateral, to operate their business while they implement a

section 363 sale process without the financing requested in this Motion.  The Debtors' ability to

obtain sufficient working capital to operate through an auction and closing is critical to

preserving the Debtors' going concern value and maximizing the value of the Debtors' assets for

the benefit of the Debtors' estates and creditors.

## RELIEF REQUESTED

37.    By this Motion, the Debtors seek entry of an order:

(a)    Authorizing the Debtors to obtain secured postpetition financing (the "DIP Facility") from Wells Fargo (the "Lender") on an interim basis for a period through and including the date of the Final Hearing pursuant to the terms and conditions of the Credit Agreement dated August 17, 2010, by and between Wells Fargo, as lender, and the Debtors, as borrowers (the "DIP Agreement");

(b)    Authorizing the Debtors to use Wells Fargo's and Getzler Henrich's cash collateral and granting adequate protection for the use thereof;

(c)    Granting the Lender, automatically and properly perfected security interests in and liens on all of the Collateral (as defined below), subject to the priorities set forth in the DIP Agreement and Interim Financing Order;

(d)    Granting the DIP Facility and all DIP Obligations (as defined in the Interim Financing Order) allowed superpriority administrative expense claim status in these cases pursuant to section 364(c)(1) of the Bankruptcy Code;

(e)    Authorizing the Debtors to use the proceeds of the DIP Facility for, among other things, working capital and general corporate purposes as provided in the budget attached to the Interim Financing Order as Exhibit 1 (the "Budget");

(f)    Modifying the automatic stay to the extent set forth in the DIP Agreement and Interim Financing Order; and

(g)    Scheduling the Final Hearing.

## Terms of the DIP Facility

38.    Consistent with this Court's requirements under the General Order Adopting

Guidelines for Financing Requests dated November 25, 2009 (the "Financing Guidelines"),

Section I(A)2., the significant terms of the DIP Facility are:[7]

_____

[7] This summary is qualified in its entirety by the terms and provisions of the DIP Agreement and Interim Financing Order.  If there is any conflict between this summary and the DIP Agreement, the terms of the DIP Agreement shall control.  Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the DIP Agreement, a copy of which is attached hereto as **Exhibit B**.

46726/0001-6921267v1

(a)    Borrower(s):  RCLC, Ronson Aviation and Consumer Products

(b)    Guarantor(s):  RCC, Inc. f/k/a Ronson Corporation of Canada Ltd.
("RCC"), a non-debtor subsidiary of RCLC.

(c)    Lender:  Wells Fargo Bank, National Association in its broadest and most
comprehensive sense as a legal entity, and not limited in its meaning to
Lender's Wells Fargo Capital Finance operating division, or to any other
operating division of Lender.

(d)    Closing Date:  The date upon which the Interim Financing Order has been
entered and all conditions precedent to the initial Advance and this
Agreement have been satisfied or waived by Lender in writing.

(e)    Type and Amount of the DIP Facility and Availability Thereunder:  The
DIP Facility is a priming, super-priority secured revolving credit facility in
an aggregate principal amount not to exceed $2,700,000 at any time
outstanding.  The DIP Facility also provides for an Accommodation
Overadvance Limit up to $2,450,000 from the Closing Date through the
Termination Date.  The Availability under the DIP Facility means the
amount, if any, by which the Borrowing Base exceeds the outstanding
principal balance of the Revolving Note.  Advances under the DIP Facility
are subject to a Borrowing Base equal to the lesser of the Maximum Line
Amount ($2,700,000) or the sum of the product of the Accounts Advance
Rate times Eligible Accounts, plus the lesser of (A) thirty-six percent
(36%), or such lesser rate as the Lender in its sole discretion may deem
appropriate from time to time, of Eligible Inventory owned by Ronson
Aviation, (B) eighty-five percent (85%), or such lesser rate as the Lender
in its sole discretion may deem appropriate from time to time, of the Net
Orderly Liquidation Value of Eligible Inventory owned by Ronson
Aviation, or (C) $200,000, less (i) the Borrowing Base Reserve, (ii) the
amount of all Pre-Petition Obligations owing to Lender (excluding the
outstanding principal balance of the Real Estate Term Advance), (iii) the
amount of the Carveout, (iv) Indebtedness that Borrowers owe to the
Lender that has not yet been advanced on the Revolving Note, and any
indebtedness owed by the Borrowers to Wells Fargo Merchant Services,
L.L.C.

(f)    Fees:  The Debtors are obligated to pay certain fees in connection with the
DIP Facility, including the following: (i) an Origination Fee of $10,000,
(ii) an Unused Line Fee at the rate of one-quarter of one percent (.25%)
per annum on the average daily Unused Amount, (iii) a Collateral
Monitoring Fee in the amount of $1,000 per month, (iv) Collateral Exam
Fees (which fees are currently $950 per day per collateral examiner),
together with any reasonable related out-of-pocket costs and expenses
incurred by the Lender, (v) Collateral Monitoring Service Fees, (vi)
Overadvance Fees in the amount of $500.00 for each day or portion

14

thereof during which an Overadvance exists (other than the
Accommodation Overadvance), unless the Overadvance has been agreed
to in writing in advance by the Lender without payment of any fee, and
(vii) other fees and charges that the Lender may from time to time impose
as consideration for Advances made in excess of Availability or for other
events that constitute an Event of Default or a Default hereunder,
including fees and charges for the administration of Collateral by the
Lender, and fees and charges for the late delivery of reports, which may be
assessed in the Lender's sole discretion on either an hourly, periodic, or
flat fee basis, and in lieu of or in addition to imposing interest at the
Default Rate.

(g)     <u>Costs and Expenses</u>:  The Debtors are also required to pay on demand all
actual costs and expenses, including reasonable attorneys' fees, incurred
by the Lender in connection with the Indebtedness, the DIP Credit
Agreement, the Loan Documents, and any other document or agreement
related hereto or thereto, and the transactions contemplated hereby,
including all such costs, expenses and fees incurred in connection with the
negotiation, preparation, execution, amendment, administration,
performance, collection and enforcement of the Indebtedness and all such
documents and agreements and the creation, perfection, protection,
satisfaction, foreclosure or enforcement of the Security Interest.

(h)     <u>Availability Period</u>:  The period from the Closing Date up to but excluding
the Termination Date.

(i)     <u>Use of Proceeds</u>:  The Borrower shall use the proceeds of Advances for
the purpose of funding post-petition operations in accordance with the
Budget.  No proceeds of any Advance may be utilized by the Borrower to
finance in any way any professional fees, disbursements, costs or expenses
(i) incurred in connection with asserting, investigating, or preparing any
claims or causes of action against the Lender, or its counsel or advisors
(including advisors to their counsel), (ii) arising from or relating to the
Pre-Petition Credit Agreement or this Agreement and/or (iii) investigating,
challenging or raising any defenses to the Indebtedness and/or Liens under
the Pre-Petition Credit Agreement or this Agreement.

(j)     <u>Termination Date</u>:  The earliest of (i) the Maturity Date [October 1, 2010],
(ii) the date the Borrowers terminate the Credit Facility pursuant to the
terms of the DIP Agreement, or (iii) the date the Lender demands payment
of the Obligations, following an Event of Default, pursuant to Section 7.2
of the DIP Agreement.

(k)     <u>Conditions to Initial Advances</u>: The Lender's obligation to make the initial
Advances shall be subject to the condition precedent that the Lender shall
have received, among other things, the following: (i) the entry Interim
Financing Order by the Bankruptcy Court not later than August 19, 2010,

15

and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated absent the prior written consent of the Lender, (ii) payment of all fees due under the terms of the DIP Agreement through the date of the initial Advance and payment of all expenses incurred by the Lender through such date and that are required to be paid by the Borrower under the DIP Agreement, (iii) the Budget, in form and substance satisfactory to the Lender, (iv) acknowledgement by the Borrower of the full amount of the Pre-Petition Obligations owing to Lender, and shall have executed a release in favor of Lender with respect to any and all claims and defenses that may be asserted by the Borrower; provided, however, that the official creditors' committee appointed in the Chapter 11 Case, if any, will have the ability to investigate such matters and the foregoing releases and acknowledgements shall be binding on the estates if the creditors' committee does not initiate an adversary proceeding on or before September 30, 2010, and (v) such other documents as the Lender in its sole discretion may require.

(l)  Conditions to Additional Advances:  In addition to the Conditions to the Initial Advances, the Lender's obligation to make each Advance shall be subject to the further conditions precedent including, among other things, (i) Borrower's compliance with the Budget, (ii) entry of the Final Financing Order (for any Advances after the August 31, 2010), (iii) the absence of any Material Adverse Change, and (iv) compliance with any then applicable deadlines set forth in the Sale Transaction Schedule, unless otherwise expressly agreed to in writing by Lender in its sole discretion.

(m)  Security:  Subject to the Carve-Out, all DIP Obligations will be secured by (i) a first priority perfected lien on, and security interest in, all present and after-acquired property of the Debtors not subject to a lien or security interest on the Filing Date; and (ii) a first priority, perfected senior priming lien on, and security interest in, all property of the Debtors that is subject to a perfected lien or security interest on the Filing Date securing the Prepetition Loans (all of the foregoing collectively, the "Collateral").

(n)  Superpriority Claim:  Subject to the Carve-Out, the Lender shall have claims entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 or any other provisions of the Bankruptcy Code.

(o)  Carve-Out:  All fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a).

(p)    Interest Rate:  With respect to (i) Revolving Advances evidenced by the Revolving Note (other than the Accommodation Overadvance), an annual interest rate equal to the sum of the Prime Rate plus three and one-half percent (3.50%) and (ii) with respect to the Accommodation Overadvance, an annual interest rate equal to the sum of the Prime Rate plus eight percent (8.00%).

(q)    Default Interest Rate:  During the a Default Period, the loans shall accrue interest at an additional 3.00% per annum.

(r)    Sale Milestones:  The Debtors' ability to obtain Advances under the DIP Facility is subject to the Debtors' compliance with certain milestones for a sale of the Debtors' assets under section 363 of the Bankruptcy Code, including (i) the Debtors' entry into a Stalking Horse Agreement shall be on or before August 26, 2010; (ii) the Sale Transaction Motion shall have been filed and approved by the Bankruptcy Court on or before August 31, 2010; (iii) the Freeholders of the County of Mercer, New Jersey shall have approved the assignment of that certain lease between RAI, as lessee, and County of Mercer, as lessor, dated May 14, 1975, as amended, as more particularly described in the Mortgage, to the proposed purchaser under the Sale Transaction Agreement on or before September 7, 2010; (iv) Borrower shall have completed an auction with respect to the Sale Transaction and filed a motion to approve the sale of all of the Borrower's assets pursuant to Section 363(b) of the Bankruptcy Code on or before September 27, 2010; (v) the Bankruptcy Court shall have entered the Sale Order on or before September 29, 2010; and (vi) the Sale Transaction shall be consummated pursuant to the terms of the applicable Sale Transaction Agreement on or before October 1, 2010.

(s)    Events of Default:  The DIP Agreement sets forth various Events of Default, including without limitation, (i) failure to make payments when due, (ii) material breaches of representations and warranties, (iii) ownership interests in the assets of a Borrower shall be sold or transferred in any transaction other than a Sale Transaction, or shall become subject to a Lien, (iv) the filing of a motion to surcharge the Lender or the Collateral under 11 U.S.C. § 506(c) or otherwise or to challenge the Liens or the Prepetition Lenders' Liens or challenge the provisions of the Interim Financing Order or the Final Financing Order, (v) the Final Financing Order has not been entered by the Bankruptcy Court on or before August 31, 2010, (vi) dismissal or conversion of the cases to cases under chapter 7 of the Bankruptcy Code, (vii) a Change of Control occurs, (viii) the Lender believes in good faith that the prospect of payment in full of any part of the Indebtedness, or that full performance by a Loan Party under the Loan Documents, is impaired, or that there has occurred after the Petition Date any material adverse change in the business or financial condition of a Loan Party, (ix) appointment of a custodian, chapter 11 trustee or examiner with special powers, (x) termination of the Debtors'

exclusive periods under the Bankruptcy Code; (xi) the Borrower shall liquidate, dissolve, terminate or suspend its business operation or otherwise fail to operate its business in the ordinary course, (xii) Sale Transaction Schedule milestones have not been met; (xiii) the Stalking Horse Agreement, once executed shall cease to be in full force and effect and any order entered by the Bankruptcy Court approving such Sale Transaction Agreement shall be modified, reversed, superseded, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Lender, and (xiv) other Events of Default as more specifically set forth in the DIP Agreement.

(t)     Remedies Upon Default:  Upon the occurrence of an Event of Default, the Lender may, by written notice to the Debtors and the Debtors' counsel, terminate the DIP Facility and declare the Obligations to be immediately due and payable.  The DIP Agreement also includes customary remedies including, without limitation, the right to realize on all DIP Collateral after three (3) business days' prior notice to the Debtors of a DIP Termination Date.

(u)     Adequate Protection:  As adequate protection for the use of collateral, the Prepetition Lenders will, during the pendency of the Cases, be granted replacement liens and superpriority claims, in each case, of the same relative priority, to the extent of the post-petition diminution in value of their respective prepetition collateral, subject, in each case, to the Carve-Out and the Liens.

39.     The Financing Guidelines, at Section II(A), require that certain provisions contained in the DIP Agreement and/or Interim Financing Order be highlighted, and that the Debtors justify the inclusion of such highlighted provisions.  The Debtors believe the following provisions of the DIP Agreement and Interim Financing Order implicate Section II(A) of the Financing Guidelines, and that such provisions are justified and necessary in the context and circumstances of these cases:

(a)     Section II(A)1:  The Interim Financing Order and the DIP Credit Agreement do not contemplate the cross-collateralization of prepetition and postpetition obligations (other than replacement liens or other adequate protection).

(b)     Section II(A)2:  The Interim Financing Order and the DIP Credit Agreement do not contemplate a "rollup".  However, the Interim Financing Order and the DIP Credit Agreement permit the application of

18

Prepetition Collateral to the Prepetition Obligations. Additionally, the Interim Financing Order and the DIP Credit Agreement provide that any proceeds of the sale, lease, or other disposition of the Collateral shall be applied first to payment of the DIP Obligations, and then to the Prepetition Obligations. Even if these provisions were considered a "rollup" under the facts and circumstances, interim approval is appropriate because: (i) the only parties affected by any potential rollup are Wells Fargo, which agrees to such treatment, and Getzler Henrich, who is required under the Subordination Agreement to agree to such treatment. Moreover, Wells Fargo would not consent to the DIP Financing absent the provisions set forth in the Interim Financing Order and the DIP Credit Agreement.

(c)     Section II(A)3: The Interim Financing Order requires the Debtors to acknowledge (i) the validity, enforceability and perfection of the Prepetition Lenders' prepetition liens and (ii) the amount of the Prepetition Lenders' prepetition claims. While the Debtors have acknowledged and waived the right to challenge the validity, perfection and amount of the Prepetition Lenders' prepetition liens and claims, the Interim Financing Order and DIP Credit Agreement do provide for a challenge period, albeit less than the period set forth in the Guidelines. The Interim Financing Order and DIP Credit Agreement provide that the challenge period expires September 30, 2010, the date prior to which the Sale is required to close under the terms of the Interim Financing Order and DIP Credit Agreement. The Interim Financing Order specifically provides that in accordance with Section II(A)(1) and (2) of the Court's General Order Adopting Guidelines for Financing Requests, in the event of a successful challenge to the validity, enforceability, extent, perfection, or priority of the Prepetition Liens, the Court retains the right to unwind or invalidate the relevant protections afforded to the Prepetition Lenders hereunder; *provided, however*, any such provision of the Interim Financing Order which is invalidated shall not, as applicable, affect or invalidate the remaining provisions hereof, which shall continue, to the extent applicable, in full force and effect.

(d)     Section II(A)4: The DIP Agreement and Interim Financing Order contain several provisions that may be construed as a "waiver" within the meaning of Section II(A)4. For instance, the DIP Agreement and Interim Financing Order contain provisions that proscribe the Debtors' or the Creditors Committee's ability to grant a junior postpetition lien or to obtain future use of cash collateral under certain circumstances, including upon an Event of Default, and the Interim Financing Order includes provisions that may be considered prospective waivers with respect to the Lender and Prepetition Lenders.

(e)     Section II(A)5: The DIP Agreement and Interim Financing Order require the Debtors to waive the estates' rights under section 506(c) of the Bankruptcy Code. The DIP Agreement and Interim Financing Order also

19

provide that any request by the Debtors to surcharge the Collateral shall constitute an Event of Default under the DIP Facility. These provisions were a condition to the DIP Agreement required by the Lender, and the Lender has advised the Debtors that it will not extend the DIP Facility if the Interim and Final Order without this protection. The Debtors do not believe any section 506(c) claims exist at this time. Accordingly, the Debtors believe this provision is reasonable under the specific circumstances of this case and, moreover, is necessary to enable the Debtors to obtain the financing they need to operate postpetition.

(f)     Section II(A)6:  The Interim Financing Order and the DIP Credit Agreement do not contemplate the granting of liens on the Debtors' claims and causes of action arising under §§ 542, 544, 545, 547, 548, 550, 551 and 553 of the Bankruptcy Code, and the proceeds thereof, or a superpriority administrative claim payable from the proceeds of such claims and causes of action, as avoidance actions and recoveries therefrom are preserved for the Debtors and their estates.

(g)     Section II(A)7:  The only "Carve-out" provided for in the DIP Agreement and Interim Financing Order relates to the fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee pursuant to 28 U.S.C. § 1930(a).

(h)     Section II(A)8:  The Debtor will not be permitted to use either cash collateral or the DIP Facility if there is an Event of Default, which are described above in paragraph 38(s). The DIP Agreement and Interim Financing Order also provide that the automatic stay shall be terminated pursuant to the Interim Financing Order, but that the Lender, or Wells Fargo, as the case may be, shall be required to give the Debtors and the Debtors' counsel at least three (3) business days prior notice of any exercise of remedies against the Collateral. Under the DIP Agreement and Interim Financing Order, upon an Event of Default, the Debtors' right to use Cash Collateral is terminated, provided that (i) with the written agreement of the Lender (after consultation with the Prepetition Lenders) or (ii) pursuant to an order of the Court upon emergency motion and upon no less than three (3) full business days' notice to Lender and the Prepetition Lenders, the Debtors may use an amount of Cash Collateral necessary to preserve and protect the Collateral, which may include ongoing operations for a period not to exceed thirty (30) days or such additional period of time to which Lender agrees in its sole discretion.

40.     The Debtors believe that each of the foregoing provisions is reasonable under the

circumstances of this case and necessary to enable the Debtors to obtain the financing they

require to pursue a sale of their assets as a going concern and thereby maximize the value of their

46726/0001-6921267v1

estates.  After more than a year of forbearance, the Lender has required each of these provisions as a condition to entering the DIP Agreement extending postpetition financing.  The Debtors do not believe that the Lender will extend the proposed DIP Facility if any of the foregoing provisions are not approved.

41.     Moreover, the Debtors believe that, after diligent consideration of all known circumstances, in their reasonable business judgment, that the Budget is achievable and will allow the Debtors to operate in Chapter 11 pending the Sale without the accrual of unpaid liabilities.

## BASIS FOR THE RELIEF REQUESTED

### A.     The DIP Facility Should Be Approved

42.     Bankruptcy Code section 364(c) provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses specified in Bankruptcy Code section 503(b) or 507(b), (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien.  11 U.S.C. § 364(c).

43.     Bankruptcy Code section 364(d) further allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.  11 U.S.C. § 364(d).

44.     Due to their current financial condition, the Debtors have been unable to procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange

21

for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) and/or

(iv) without granting the proposed DIP liens pursuant to section 364(d).  Moreover, in light of

the Company's current financial state, including the existing defaults under the Prepetition Credit

Facility and the surrounding circumstances, including the impending Sale, the Company could

not reasonably obtain the financing from an outside source – certainly not one that would agree

to be subordinate to the Prepetition Liens.

45.     Indeed, given the complexity and immediacy of the Debtor's financing needs, the

Debtors moved quickly and in a targeted manner to ensure they would be able to negotiate a new

financing facility with Wells Fargo.  There is no reason to believe that the Debtors could have

located a different post-petition lender offering terms more favorable than the Lender that would

warrant a priming dispute with the Prepetition Lenders.  The Debtors' management and Board

took the steps they deemed necessary in exercising their sound and reasonable business judgment

to negotiate the DIP Facility.  The Debtors' ability to deliver a priming lien over the Prepetition

Lenders' objection would be uncertain, at best, and would require an extended and costly

evidentiary hearing on the issue of adequate protection.  *See Swedeland Dev. Group, Inc.*, 16

F.3d 552 (3d Cir. 1994).

46.     Having determined that financing is available only under Bankruptcy Code

sections 364(c) and (d), the Debtors negotiated the DIP Agreement with the Lender extensively

and at arms' length.  The Debtors believe that, in their business judgment, entering into the DIP

Agreement is in the best interests of their estates and creditors.  Provided that a debtor's business

judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code,

courts grant a debtor considerable deference in acting in accordance therewith.  *See, e.g., Bray v.

Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986);

*In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994), *rev'd on other grounds by* 134 F.3d 188 (3d Cir. 1998) (approving interim loan, receivables facility and asset-based facility based on the debtor's business judgment); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (stating, "[c]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Funding Sys. Asset Mgmt. Corp.,* 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah 1981).

47.     Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, a debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien.  *In re Snowshoe Co.,* 789 F.2d at 1088; *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).

48.     Given that substantially all of the Debtors' assets are encumbered by Wells Fargo's and Getzler Henrich's prepetition liens and security interests, and the Debtors' inability to obtain more favorable financing proposals, the Debtors determined that the proposed DIP Facility is the only reasonable prospect for the financing the Debtors need to preserve their going concern value while they implement a section 363 sale process.  Accordingly, the Debtors' decision to enter into the DIP Credit Agreement represents an exercise of their sound business judgment.

49.     The Debtors and the Lender have engaged in good faith and extensive arms-length negotiations in an effort to agree on the terms and conditions of the DIP Agreement and

23

the Interim Financing Order, and the Debtors believe they have negotiated the best financing

arrangement available under the circumstances.  The failure to approve the DIP Facility

(including the loss of jobs and going-concern value of the Debtors' business) would be

catastrophic to the Debtors, their employees, creditors and other parties in interest.  Accordingly,

the Court should enter the Interim Financing Order and authorize the Debtors to enter into the

DIP Agreement.

**B.**      **The Debtors' Use of Cash Collateral Should Be Approved**

50.      The Debtors also submit that the Court should authorize the Debtors to use cash

collateral pending the Final Hearing, subject to the Budget, and grant the adequate protection

provisions set forth in the Interim Financing Order.

51.      Section 362(c)(2) of the Bankruptcy Code provides that the Debtors may not use

cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B)

the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the

provisions of [section 363]."  11 U.S.C. § 363(c)(2).  Here, Wells Fargo and Getzler Henrich, the

entities with interests in cash collateral, have consented upon the terms set forth in the Proposed

Interim Financing Order.

52.      Section 363(e) of the Bankruptcy Code provides that, upon request of an entity

that has an interest in property to be used, sold or leased by a debtor, the court shall prohibit or

condition such use as is necessary to provide adequate protection of such interest.  11 U.S.C. §

363(e).  In addition, section 364(d) also requires that adequate protection be provided where a

secured creditor's liens are being primed to secure the obligations under a debtor in possession

financing facility, as is the case here.  11 U.S.C. § 363(e).

24

53.     The Interim Financing Order contemplates various protections for the Prepetition

Lenders' respective interests in cash collateral, including, *inter alia*, current payment of interest

and expenses to Wells Fargo, and replacement liens and allowed super-priority claims to each of

the Prepetition Lenders.  The Prepetition Lenders have agreed that these protections are

adequate.  *See In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *In re Beker Indus. Corp.*,

58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

54.     Based on the extent of the protections provided to the Prepetition Lenders for the

use of their cash collateral, as well as the Prepetition Lenders' consent to the use of their cash

collateral subject to the terms of the Budget and Interim Financing Order, the Debtors submit

that the Court should authorize the use of cash collateral.

**C.      The Automatic Stay Should Be Modified on a Limited Basis**

55.     The relief requested in the Motion contemplates a modification of the automatic

stay (to the extent applicable) to permit the Debtors to grant the liens, security interests and

superpriority claims described above and to perform such acts as may be reasonably required to

assure the perfection and priority of such security interests and liens.  The Debtors further

request that the automatic stay be lifted and/or modified, to the extent necessary, to permit the

Lender to exercise (i) immediately upon the occurrence of an Event of Default, all rights and

remedies under the DIP Agreement, the Interim or Final Financing Orders, as applicable, other

than those rights and remedies against the Collateral, and (ii) upon the occurrence and

continuance of an Event of Default, and the giving of three (3) business days' written notice to

the Debtors and counsel to the Debtors, all rights and remedies against the Collateral.

56.     Stay modifications of this kind are customary features of debtor-in-possession financing facilities and, in the Debtors' business judgment, the stay modifications requested herein are reasonable and fair under the circumstances.

**D.      Interim Approval Should Be Granted**

57.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing. Fed. R. Bankr. P. 4001.

58.     Pursuant to Bankruptcy Rules 4001(b) and (c), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and (a) authorize the Debtors to borrow up to $609,000 (with net advances of approximately $107,000) under the DIP Agreement on an interim basis, pending entry of the Final Financing Order, in order to (i) maintain and finance the Company's ongoing operations, (ii) avoid immediate and irreparable harm to the Debtors' estates, business operations, employees and other parties in interest, and (b) schedule the Final Hearing.

59.     Currently, the Debtors do not have sufficient funds to operate on an ongoing basis, and the Debtors have an urgent and immediate need for cash to continue their operations. The availability of interim loans under the DIP Facility will provide necessary assurance of the Debtors' ability to meet their near-term obligations and will ensure that the Debtors are able to maintain their going concern value as they pursue a sale.  Accordingly, interim relief is necessary

to preserve and maintain the Debtors' operations for the benefit of the Debtors' estates and creditors.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter the Interim Financing Order, substantially in the form attached hereto as **Exhibit A**, (a) approving the Debtors' post-petition financing, (b) authorizing the Debtors' use of cash collateral, (c) granting adequate protection, (d) modifying the automatic stay as provided therein, (e) scheduling a final hearing and (f) granting such other and further relief as the Court deems appropriate.

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Proposed Attorneys for RCLC, Inc., *et al*.

By: _____ */s/ David M. Bass* _____
　　　Michael D. Sirota
　　　David M. Bass

DATED:  August 17, 2010

27

**VERIFICATION**

DARYL HOLCOMB, of full age, certifies as follows:

1.      I am the Chief Financial Officer of each of the within debtors and debtors-in-possession (the "Debtors").  As such, I have full knowledge of the facts set forth in, and am duly authorized to make this Application on the Debtors' behalf.

2.      I have read the Verified Application and certify that the statements contained therein are true based upon my personal knowledge, information and belief.

3.      I am aware that if any of the factual statements contained in the Verified Application are willfully false, I am subject to punishment.

DATED: August 17, 2010                    */s/ Daryl Holcomb*
                                         DARYL HOLCOMB

46726/0001-6921267v1