**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
(201) 489-3000
(201) 489-1536 Facsimile
Michael D. Sirota, Esq.
David M. Bass, Esq.
Proposed Attorneys for RCLC, Inc., *et al.*
Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NOS. 10-35313, 10-35315, 10-35318
Chapter 11
(Joint Administration Requested)

In re:

RCLC, INC. f/k/a Ronson Corporation, *et al.*,

Debtors-in-Possession.

**AFFIDAVIT OF DARYL K. HOLCOMB**
**IN SUPPORT OF THE DEBTORS'**
**VARIOUS "FIRST DAY MOTIONS"**

STATE OF NEW JERSEY   )
                      ) ss.
COUNTY OF MERCER      )

DARYL K. HOLCOMB, of full age, being duly sworn according to law, upon his oath

deposes and states:

1.      On the date hereof (the "Filing Date"), RCLC, Inc. f/k/a Ronson Corporation

("RCLC"), Ronson Aviation, Inc. ("Ronson Aviation") and RCPC Liquidating Corp. f/k/a

Ronson Consumer Products Corporation ("Consumer Products"), as debtors and debtors-in-

possession herein (collectively, the "Company" or the "Debtors"), each commenced in this Court

a case under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as

amended (the "Bankruptcy Code").  I am the Vice President, Chief Financial Officer and

Controller of the Company and have been continuously employed by the Company since 1988.  I

have been a Vice President of RCLC since 1996, Chief Financial Officer since 1993 and

Controller and Treasurer since 1988.  I have served as Treasurer of RCLC from 1988 to 2005.  In

my current capacity, I am fully familiar with the Debtors' day-to-day operations, business affairs

and records, and am duly authorized to make this Affidavit on the Debtors' behalf.

2.      To minimize the potentially adverse effects which the commencement of these

Chapter 11 cases may have on the Debtors' ability to continue operations while it works to

consummate the Aviation Sale (as defined below), and to facilitate an orderly transition into

Chapter 11, the Debtors have filed certain "first day" motions and applications with the Court

(individually, a "First Day Motion" and collectively, the "First Day Motions").  I am familiar

with each of the First Day Motions and believe the relief sought therein is required to facilitate

an orderly transition into Chapter 11 and avoid the immediate and irreparable harm the Debtors

will suffer if they are not authorized to obtain financing, use cash collateral, make certain

essential payments and otherwise continue their business operations as requested in the First Day

Motions.

3.      In accordance with the Local Rules and given the nature of these Chapter 11

cases, the Debtors have requested that the Court schedule a hearing at its earliest convenience to

consider the First Day Motions.  The Debtors will continue to operate their businesses and

manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the

Bankruptcy Code.

4.      I submit this Affidavit to assist the Court and other parties-in-interest in

understanding the circumstances that compelled the commencement of these Chapter 11 cases

46726/0001-6923385v1

and in support of the Debtors' voluntary Chapter 11 petitions and various motions and

applications of the Debtors filed with the Court contemporaneously herewith.  Except as

otherwise indicated, all facts set forth in this Affidavit are based upon my personal knowledge,

my discussions with other members of the Debtors' senior management and the Debtors'

professional advisors, my review of relevant documents, or my opinion based upon my

experience, knowledge, and information concerning the Debtors' operations and financial affairs.

If I were called upon to testify, I would testify competently to the facts set forth in this Affidavit.

5.      This Affidavit is divided into three (3) parts.  Part I describes the Debtors'

businesses, history, and the Debtors' prepetition organizational and debt structure.  Part II

describes the circumstances leading to the Chapter 11 filings, including the need to effectuate the

Aviation Sale.  Part III sets forth the relevant facts in support of each of the First Day Motions.

## I. <u>BACKGROUND</u>

### A.      <u>General Overview of the Debtors' Businesses</u>

6.      RCLC, is a New Jersey corporation incorporated in 1928.  Prior to March 2, 2009,

RCLC's shares of common stock were listed on the NASDAQ Capital Market and quoted under

the symbol RONC.  Effective March 2, 2009, RCLC's shares of common stock are traded on the

Over-the-Counter Pink Sheets and quoted under the symbol RONC.PK.

7.      RCLC is a holding company and does not conduct business operations except

through its subsidiary entities.  Consumer Products and Ronson Aviation are each wholly-owned

subsidiaries of RCLC.  Consumer Products and Ronson Aviation are each a New Jersey

corporation.

8.      Given the integrated nature of the Debtors' operations, the Debtors share various

administrative and business functions.  All finance, public issuer regulatory matters, treasury,

cash management and executive functions for the Debtors and RCLC's non-debtor subsidiaries

3

are provided by RCLC.  In addition, many material contracts for the benefit of the Debtors and certain non-debtor subsidiaries of RCLC are with RCLC as the named counterparty.

9.      RCLC employs five (5) full-time employees and one (1) part-time employee. Ronson Aviation employs twenty-seven (27) employees, four (4) of whom are full-time salaried employees and twenty-three (23) of whom are full-time hourly employees.  Consumer Products no longer has any employees.  The Company is not currently party to any collective bargaining agreement.  As of December 31, 2009, the Company employed a total of ninety-one (91) full-time employees.

10.     Historically, the Company has been engaged principally in the following businesses: (i) consumer products[1] and (ii) aviation-fixed wing and helicopter services.

11.     For fiscal year ended December 31, 2009, the Debtors' consumer products division and aviation operations, respectively, generated net sales of approximately $10.969 million and $7.769 million and each had operating losses.  The consumer products division had losses (before intercompany charges and income taxes) of approximately $2.693 million and the aviation operations sustained operating losses of $.807 million.  For the three months ended March 31, 2010, the Debtors had consolidated net sales of approximately $4.844 million and losses (before intercompany charges and income taxes) of approximately $1.364 million.

12.     As of March 31, 2010, the Debtors' consolidated balance sheet listed assets totaling approximately $12.670 million, and liabilities totaling approximately $15.427 million.

---

[1] As described below, on February 2, 2010, the Company completed the sale of its consumer products business to Zippo Manufacturing Company and Nosnor, Inc. (collectively, "Zippo").  Consumer Products no longer conducts any ongoing business operations.

13.     In the three fiscal years prior to 2010, the percentage of total sales from each of the Company's divisions was as follows:

|  | Consumer Products | Aviation Operations and Services |
|---|---|---|
| 2009 | 51% | 49% |
| 2008 | 52% | 48% |
| 2007 | 53% | 47% |

14.     A general description of each of the Debtors' historical businesses is as follows:

**B.      The Consumer Products Business**

15.     Prior to its sale to Zippo (as described below), the Company's consumer products business enjoyed a very long history and strong reputation as a lighter and flame accessories company.  Formed in 1886 by Louis V. Aronson, grandfather of the current President and CEO since 1953, Louis V. Aronson II, the Company diversified its product line and grew into a multinational corporation, with wholly owned subsidiaries in seven (7) countries outside the United States.  Prior to its sale to Zippo, the Company was a leading manufacturer and distributor of branded flame accessory consumer products since the 1920s.  As a result of its long history and strong reputation, the Ronson® brand name became universally recognized as the standard in the flame accessory products market.

16.     The Company's consumer packaged products, which had been manufactured in Woodbridge, New Jersey and distributed in the United States by the Company's consumer products business, included Ronsonol lighter fluid, Multi-Fill butane fuel injectors, flints, wicks for lighters, and a multi-use penetrant spray lubricant product under the tradename "Multi-Lube". In addition, the Company's consumer packaged products were marketed in Canada through non-debtor Ronson Corporation of Canada Ltd. n/k/a RCC, Inc. ("RCC").  The Company's consumer products business also marketed a number of lighters and torches in the United States and Canada.

46726/0001-6923385v1

17.     As set forth in more detail below, shortly after the sale to Zippo, Ronson

Consumer and RCC ceased operations.

**C.      The Ronson Aviation Business**

18.     As more fully described below, Ronson Aviation is a full-service Fixed Base

Operator (FBO) which operates at the Trenton-Mercer Airport, Trenton, New Jersey.  Ronson

Aviation provides a wide range of general aviation services to the general public and to

government agencies.  Those services include aircraft fueling, cargo handling, avionics, new and

used aircraft sales, aircraft repairs, aircraft storage and office rental.  Ronson Aviation is the sole

full-service FBO at Trenton-Mercer Airport.

19.     Ronson Aviation's traces its history to 1962 with the founding of a small

helicopter services company at Trenton-Mercer County Airport known as New Jersey Helicopter

Airways, Inc. ("NJHAI").  In 1965, NJHAI was purchased by RCLC as a wholly-owned

subsidiary, as part of the diversification of the Company led by Louis V. Aronson II.  The name

was then changed to Ronson Helicopters, Inc. ("RHI") and soon became a major helicopter air

taxi operator and repair facility in the northeast United States.

20.     In 1973, RHI acquired Trenton Aviation, Inc., a small FBO at Mercer County

Airport.  At the same time, RHI displaced Rockwell Aviation, the primary FBO, and took over

the hangar/office structure it occupied.  With these changes, RHI became the primary fixed base

operator as well as a full-service aviation company providing helicopter and airplane air charter,

aircraft repairs, and new and used aircraft sales to the general public.  RHI changed its name in

1975 to Ronson Aviation, Inc. to reflect its expanded services.  Ronson Aviation is an FAA

approved repair station under Part 145 of the Federal Aviation Regulations (FARs).

21.     In 1976, Ronson Aviation commenced construction of a 52,900 square foot

hangar/office complex, with completion occurring in 1978.

6

22.     Ronson Aviation formed its own avionics department in May 1993 to operate an avionics repair service on the premises.  Shortly after, in December 1993, Ronson Aviation received approval as an FAA Radio Repair Station Class I & II.

23.     In November 2007, Ronson Aviation completed construction of a 19,300 square foot additional hangar/office, which gave Ronson Aviation the capability of providing hangar space to Gulfstream 650 class aircraft.

24.     Ronson Aviation owns no real property.  Rather, Ronson Aviation leases the property, covering approximately 18.4 acres, from which it conducts its operations pursuant to the terms of an Agreement and Lease, entered into as of May 14, 1975, with Mercer County (as amended, the "Aviation Lease").  The annual rent and fees for fuel flowage and landing commissions under the Aviation Lease is approximately $170,000.  Upon completion of the new hangar in 2007, Ronson Aviation extended the Aviation Lease for a period of 25 years.  The Aviation Lease currently expires in 2032.

25.     As a full service FBO, Ronson Aviation provides aircraft fueling and servicing, hangar and office rentals, aircraft maintenance and modification and avionics sales, service and installation.  The Company maintains FAA repair station certifications for Class I Communications Equipment; Class II Navigation Equipment; and Class III All Metal Airframe.  Furthermore, Ronson Aviation is an FAA approved repair station for major and minor airframe and engine service as well as an avionics repair station for service and installations and a factory-authorized Hawker Beechcraft Aircraft Parts Service Center, Cessna Aircraft and Cirrus Aircraft service station.  Ronson Aviation is one of only two factory-authorized Hawker Beechcraft Turbine service centers in the Northeast and one of three Hawker Beechcraft Piston service centers in the Northeast.

- ***Building and Ramp Operations:***

26.     Ronson Aviation provides hangar, T-hangar and tie-down storage options to both resident and transient aircraft (resident aircraft primarily occupy hangar and tie-down space). Long term leases are available for all of Ronson Aviation's storage options.

27.     Ronson Aviation has the indoor hangar storage capability to house private jets as large as a Gulfstream 650.  Ronson Aviation's storage options can handle the following:

- 24 aircraft in its T-hangar spaces (28,000 square feet)

- Between 8 and 25 aircraft in the corporate aircraft storage hangar (40,300 square feet)

- More than 60 aircraft in the tie-down hangar area

28.     The Company has approximately 7,100 square feet of leasable office space.

- ***Fuel Services***

29.     Ronson Aviation sells AirBP aviation fuel under a dealer arrangement with AirBP.

30.     Ronson Aviation houses the following types of fuel on-site at its fuel farm complex:

- Jet-A fuel (two 25,000 gallon fuel tanks)

- 100LL fuel (one 6,000 gallon fuel tank)

- Auto Gasoline (one 2,000 gallon fuel tank)

- Diesel fuel (one 500 gallon fuel tank)

- ***Customer Base***

31.     Ronson Aviation provides its services and sells fuel to a variety of customers.  In the 12 months preceding the Filing Date, Ronson Aviation serviced approximately 4,500 aircraft arrivals.  Approximately 83% of Ronson Aviation's customers utilize Ronson Aviation's FBO

8

three (3) or fewer times during a given year; the remaining 17% utilize the FBO more than three (3) times per year.  Ronson Aviation handles an average of 375 flights per month at its operations.  Ronson Aviation's customers are designated as one of the following:

- Base Customers:  these customers are any aircraft that reside at Trenton-Mercer County Airport to which Ronson Aviation sells fuel.

- Fractional: this group consists of customers using fractional shares as part of national account programs such as NetJets, Flight Options, FlexJet, XO Jet, Avantair, Citationair etc.  These customers account for approximately 20% of Ronson Aviation's overall fuel sales.

- Military/Government.

- Transient: all other customers that are not designated base, fractional, or military/government.

32.     Because Ronson Aviation provides superior customer service, quality aircraft maintenance and repair, crew amenities and competitive fuel prices, it has made and will continue to make Trenton-Mercer Airport an attractive option versus other regional airports for both frequent corporate travelers and leisure aviation pilots.

**D.     The Debtors' Pre-Petition Debt Structure**

- ***The Prepetition Credit Facility with Wells Fargo***

33.     The Debtors and non-debtor RCC are parties to a pre-Filing Date senior secured financing facility (the "Prepetition Credit Facility") with Wells Fargo Bank, National Association ("Wells Fargo"), acting through its Wells Fargo Business Credit operating division, governed by the terms of a Credit and Security Agreement dated as of May 30, 2008 (as amended, modified, supplemented or restated from time to time, the "Credit Agreement").  As

9

executed, the Prepetition Credit Facility consisted of (a) a revolving credit facility in an amount up to $4.0 million (the "Revolving Credit Facility"), and (b) the following term loans: (i) an Equipment Term Advance in the original principal amount of $837,500; and (ii) a Real Estate Term Advance in the original principal amount of $2,922,500.  Consumer Products, Ronson Aviation and non-debtor, RCC, are the "Borrowers" under the Prepetition Credit Facility and RCLC is a guarantor.

34.    Amounts advanced under the Prepetition Credit Facility are secured by substantially all of the assets of the Company and its subsidiaries.[2]

35.    Borrowings under the Revolving Credit Facility are subject to a borrowing base tied to the Company's eligible inventory and accounts receivable, and other factors, as set forth in the Credit Agreement.

36.    Under the terms of the Credit Agreement, the term of the Prepetition Credit Facility was 60 months.  The Prepetition Credit Facility provides for LIBOR Advances (except during a Default Period, as such term is defined in the Credit Agreement) and Floating Rate Advances (as such term is defined in the Credit Agreement), payable at such interest rates and at such times as are provided for in the Credit Agreement, and contains minimum tangible net worth, minimum net income, minimum net cash flow and other financial covenants, certain restrictions on capital expenditures, as well as affirmative and negative covenants and events of default typical of transactions of that nature.

37.    On or around May 30, 2008, the Company applied a portion of the proceeds of the Prepetition Credit Facility to pay off its prior credit facility with CIT Group/Commercial

---

[2] Under the terms of the Credit Agreement, Wells Fargo did not have a lien or security interest in either the real property owned by Consumer Products in Woodbridge, New  Jersey, which has since been sold, or 34% of the Company's interest in RCC.

Services, Inc., as well as to pay off other debt outstanding to EPIC Aviation, LLC, Bank of the

West, and Banc of America Leasing.

- ***Defaults Under the Prepetition Credit Facility and the Forbearance Agreement***

38.     On November 21, 2008, Wells Fargo advised the Company and its subsidiaries

that "Events of Default" under the Credit Agreement had occurred.  These events of default

included the Company's failure to meet financial covenants as follows: (a) the minimum

Tangible Net Worth as of September 30, 2008, (b) the minimum Net Income for the nine months

ended September 30, 2008, and (c) the minimum Net Cash Flow for the nine months ended

September 30, 2008, and the Company's failure to meet all of the requirements of the Post-

Closing Agreement dated May 30, 2008.  As a result of the Events of Default, Wells Fargo

exercised certain of the rights available to it under the Credit Agreement, including increasing

the interest rate charged on the loans outstanding under the credit agreement by 3% retroactive to

July 1, 2008, the date of the occurrence of the Events of Default.  In addition, in November and

December, Wells Fargo exercised certain additional rights available to it under the Credit

Agreement as a result of the Events of Default and reduced the amounts available to be borrowed

under the revolving line of credit.  In December 2008, Wells Fargo required that the Company

engage a consultant to review and monitor the Company's operation and Wells Fargo increased

its monitoring of the line of credit.

39.     In December 2008, in response to suggestions from Wells Fargo, the Company's

Board of Directors began interviewing financial consultants for to assist the Company in

managing its operations and cash requirements.  On January 6, 2009, the Company engaged

Getzler Henrich & Associates LLC ("Getzler Henrich") as its financial consultant.  Getzler

Henrich is a corporate turnaround and restructuring firm which, in addition to its operational

11

restructuring focus, is experienced in restructuring, lender/creditor relationship management and financing.

40.    On February 20, 2009, the Company received from Wells Fargo an additional notification of Wells Fargo's reservation of rights and remedies relating to the previously identified Events of Default.  The notification further indicated that Wells Fargo was instituting certain restrictions and reducing loan availability.

41.    On March 30, 2009, Wells Fargo entered into a forbearance agreement with the Company under which Wells Fargo agreed not to exercise any of its additional rights and remedies available as a result of the Events of Default under the Credit Agreement through April 24, 2009, unless earlier terminated if the Company, among other things, breached the forbearance agreement.  Wells Fargo also agreed to provide the Company with an overadvance facility (i.e., the Accommodation Overadvance) in the amount of $500,000 to supplement the Company's credit line and enhance its liquidity, which bears interest at 8% over prime.  The forbearance agreement was subsequently amended on several occasions to provide, in each case, extensions of the forbearance period and, in some cases, for additional credit availability (the original agreement together with all amendments, collectively, the "Forbearance Agreement").  The last amendment to the Forbearance Agreement, the Twenty-First Amendment to Forbearance Agreement (the "Twenty-First Forbearance Amendment"), was executed as of August 10, 2010, and extended the forbearance period through August 16, 2010.

42.    In connection with the Forbearance Agreement, the Company agreed, among other things, to pursue a "Liquidity Transaction".[3]  The Forbearance Agreement, and each of the

_____

[3] A Liquidity Transaction is defined in the Forbearance Agreement as follows:

> [A transaction where] Parent and the stockholders of Parent are
> actively pursuing either a sale of all of the capital stock of RAI or

amendments thereto, specifically provide that it is a "Termination Event" under the Forbearance

Agreement if "in the Lender's discretion, it determines that Parent is no longer actively pursuing

a Liquidity Transaction".

43.      Without regard to the amounts to be restored to the Custodial Account (as

described more fully below), as of the Filing Date, outstanding principal obligations under the

Prepetition Credit Facility total approximately $3.62 million, plus such amounts as may have

accrued for interest and other fees and expenses as of the Filing Date.[4]

- ***The Engagement of Getzler Henrich & Associates LLC, as Chief Restructuring Officer***

44.      On March 30, 2009, as a condition to the Forbearance Agreement, the Company

retained Joel Getzler, of Getzler Henrich, as Chief Restructuring Officer, pursuant to the terms of

an agreement with Getzler Henrich entered into on March 30, 2009, which supplemented the

Company's earlier consulting agreement with Getzler Henrich (collectively, the "Getzler

Henrich Engagement Agreement").  In accordance with the Getzler Henrich Engagement

Agreement, Joel Getzler, as Chief Restructuring Officer, was charged with responsibility for the

Company's operations, finance, accounting and related administrative issues, subject to the

authority of and reporting to the Company's Board of Directors.

---

of all or substantially all of the assets of RAI or financing to be
provided by another lender (each a "Liquidity Transaction"), in
either case in an amount sufficient to enable the Obligors to fully
pay and satisfy the Indebtedness …

[4] Without regard to the amounts to be restored to the Custodial Account, as of the Filing
Date, the amounts due under the Prepetition Credit Facility are comprised of the following: (i)
net advances under the Revolving Credit Facility and amounts necessary to satisfy the
Accommodation Overadvance totaling $2,466,926.84; and (ii) principal and interest of
$1,153,639.70 on account of the Real Estate Term Advance.  (The Equipment Term Note was
repaid from the proceeds of the Zippo Sale and a portion of the Real Estate Term Note was
repaid consistent with the Thirteenth Forbearance Amendment, as described below).

45.     In accordance with the agreement of the parties, as set forth in, among other documents, the Getzler Henrich Engagement Agreement, the Company is obligated for fees and expenses to Getzler Henrich in connection with services provided by Mr. Getzler and his associates.  In addition, Getzler Henrich is entitled to a signing bonus in the amount of $200,000.

46.     Mr. Getzler and associates of Getzler Henrich have been involved with the Company on a virtual full-time basis since March 30, 2009.

47.     During the term of the Engagement Agreement, payments against accrued amounts, including the signing bonus, have been made to Getzler Henrich in the amount of $10,000 each week.  All accrued amounts, together with the amount of $190,000 owed to Getzler Henrich in fees prior to the appointment of Mr. Getzler as Chief Restructuring Officer, will become due upon specified liquidity events, or earlier if the Company is not in compliance under the Engagement Agreement.  The Aviation Sale will necessitate the payment of all accrued fees to Getzler Henrich.  A payment of $100,000 was made to Getzler Henrich from the proceeds of the sale of the consumer products business on February 2, 2010.

48.     All amounts owed to Getzler Henrich are secured by a collateral interest in those assets pledged to Wells Fargo, subordinated to the interest of Wells Fargo.  During the term of the Engagement Agreement, payment of salaries, fees, perks and expenses to members of the Company's Board of Directors, including those directors who also serve as officers of the Company, have been deferred.

49.     The Getzler Henrich Engagement Agreement expired upon the commencement of these Chapter 11 cases.

50.     As of the Filing Date, the Company was indebted to Getzler Henrich in the amount of approximately $2.005 million.

**E.**    **Other Debt Obligations**

51.    As of the Filing Date, the Company had other current and long-term debt in the aggregate amount of approximately $1.133 million, and certain other equipment loans aggregating approximately $8,000.00.

52.    In addition, the Debtors estimate that they have approximately $4.185 million of unsecured trade debt and other operating expenses.  Of those amounts, the unsecured trade debt and other operating expenses are attributable to the RCLC, Ronson Aviation and Consumer Products in the following estimated amounts: $2.052 million, $.639 million and $1.494 million. These unsecured obligations are in addition to the PBGC Claim (as described below) in the amount of $4.410 million, for which the Debtors are jointly and severally liable.

**F.**    **The Company's Determination to Divest Its Operations and the Sale of the Consumer Products Business to Zippo**

53.    In conjunction with the retention of its Chief Restructuring Officer, and consistent with the requirements of the Forbearance Agreement to pursue a "Liquidity Transaction", on March 30, 2009, the Company announced it had initiated plans to divest Ronson Aviation and, as more fully described below, entered into an asset purchase agreement for the sale of its aviation business, which, as also described below, that proposed purchaser ultimately breached.

54.    Shortly thereafter, the Company also determined to divest its consumer products business.  On or about July 17, 2009, the Company executed a non-binding letter of intent to sell substantially all of the assets of Consumer Products and RCC, as well as the related intellectual property owned by RCLC, to a European manufacturer of pocket and utility lighters.  The parties were unable to negotiate definitive documentation in connection with that transaction, and the Company focused on securing another buyer.

55.     On or about August 7, 2009, the Company entered into a non-binding letter of intent with Zippo for the acquisition of the Company's consumer products division.

56.     Thereafter, on or about October 5, 2009, RCLC, Consumer Products and RCC (collectively, the "Consumer Products Sellers") entered into an asset purchase agreement with Zippo (the "Consumer Products Sale Agreement") to sell to Zippo substantially all of the assets of its consumer products companies, including the name "Ronson".

57.     On February 2, 2010, subsequent to receipt of shareholder approval of the transaction at a Special Meeting of Shareholders held on February 1, 2010 (the "Special Meeting of Shareholders") following a proxy and solicitation process, the Consumer Products Sellers completed the sale of its consumer products business to Zippo for an adjusted purchase price of approximately $10.48 million in cash (the "Zippo Sale"). The Consumer Products Sale Agreement provided for a purchase price of $11.1 million in cash less certain credits to which Zippo was entitled at closing and subject to certain post-closing adjustments as described in the Consumer Products Sale Agreement. The Zippo Sale included the Ronson trade marks, trade name and other intellectual property and, as such, as part of the Zippo Sale, the Company agreed to change its name and the names of its subsidiaries.[5]

58.     At the closing of the Zippo Sale, RCLC and Consumer Products, with the consent and approval of Wells Fargo and Zippo, authorized the disbursement of the proceeds of sale as follows:

GROSS PURCHASE PRICE                                                         $11,100,000.00

        Credit for Defective Inventory
           & Related Matters                          ($425,035.00)
        Current Asset Adjustment                       $218,657.00
        Stay Bonus Amount                             ($227,000.00)

---

[5] Ronson Aviation was not required to change its name.

|  |  |  |
|---|---|---|
| Dollar General Amount | | ($182,371.00) |
| Real Estate Prorations (Taxes & Sewer Charge) | | $16,691.00 |
| Lien Release Recordation Fees | | ($4,975.00) |
| UCC Statements | ($200.00) | |
| Intellectual Property - US | ($3,175.00) | |
| Intellectual Property - Canada | ($1,600.00) | |
| One-half of Realty Transfer, etc., Taxes | | ($17,492.00) |

NET PURCHASE PRICE                                         $10,478,475.00

PAYMENTS

|  |  |  |
|---|---|---|
| Escrow Agent - First National Trust Company | | |
| Escrow Amount | $1,100,000.00 | |
| Bulk Sales Escrow Amount | $14,400.00 | |
| Additional Escrow Amount | $150,000.00 | |
| | | $1,264,400.00 |
| Trustee (Remediation Trust Fund) - First National Trust Company | | $100,000.00 |
| Wells Fargo Bank, National Association - Payoff | | $5,890,180.79 |
| Capital One (formerly North Fork Bank) | | $2,275,294.42 |
| Getzler Henrich & Associates LLC | | $100,000.00 |
| Lerner, David, Littenberg, Krumholz & Mentlik, LLP | | $33,852.00 |
| Weir Foulds LLP | | $56,521.08 |
| DAK Capital | | $655,226.71 |
| Reserve for Accrued Compensation | | $103,000.00 |

TOTAL PAYMENTS                                         $10,478,475.00

59.    Although Wells Fargo received proceeds totaling $5,890,180.79 (the "Zippo

Proceeds") on the date of the closing of the Zippo Sale, in accordance with the terms of a letter

agreement between Wells Fargo and, among others, the Debtors dated as of February 2, 2010,

regarding the proceeds from the sale of Consumer Products Sellers' assets to Zippo (the "Zippo

Sale Letter"), Wells Fargo initially applied only $3,138,228.01 of such amount to repay advances

made to the Debtors.  In accordance with the Zippo Sale Letter, Wells Fargo agreed to hold the

remaining portion of the Zippo Proceeds in the amount of $2,751,952.78 in a custodial account

in the name of and owned by Wells Fargo (the "Custodial Funds").  Pursuant to the terms of the

Zippo Sale Letter, Wells Fargo agreed that upon the closing of a sale of Ronson Aviation, it

would refund the Custodial Funds to RCLC for distribution (provided there were sufficient funds

from an Ronson Aviation transaction to do so).[6]

60.    The reason for this is to ensure that the amount of the Wells Fargo Indebtedness

satisfied from the sale of assets of each borrower-subsidiary is commensurate with the funds

advanced to each such entity.  Consumer Products, Ronson Aviation and RCC are all direct

borrowers under the Prepetition Credit Facility.  RCLC is a guarantor.  Each Debtor's assets

secure the entire debt, and as such, each Debtor is jointly and severally liable to Wells Fargo for

the full amount of the Wells Fargo Indebtedness.  However, because Consumer Products' assets

were sold first, Wells Fargo requested that the entire proceeds from such sale, which proceeds

constituted the proceeds of Wells Fargo's collateral, be delivered to Wells Fargo pending a sale

of the aviation business assets.  The Debtors agreed to Wells Fargo's request, provided that

Wells Fargo agreed to advance back to the Consumer Products Sellers the net sale proceeds

which exceed the allocable share of the debt based upon actual advances and use by the

subsidiary borrowers upon the closing of the sale of the aviation business assets.  This avoids

having Consumer Products Sellers' unsecured creditors unfairly saddled with payment of a

disproportionate share of the Wells Fargo Indebtedness merely because Consumer Products

Sellers' assets were sold first.

61.    Due to the unanticipated delay in the sale of Ronson Aviation's assets, the parties

agreed that Wells Fargo would apply the Custodial Funds to the outstanding obligations under

the Prepetition Credit Facility, first to fully repay and satisfy the Accommodation Overadvance

---

[6] Wells Fargo and the Company earmarked a portion of the Custodial Funds for certain
fees and expenses of Cole, Schotz, Meisel, Forman & Leonard, P.A.

and the balance to the Real Estate Term Advance as set forth in the Thirteenth Amendment to the

Forbearance Agreement, dated as of April 1, 2010 (the "Thirteenth Forbearance Amendment"),

and effective as of April 1, 2010.  However, under the terms of the Thirteenth Forbearance

Amendment, Wells Fargo agreed that upon receipt of the Closing Notice (as defined in the

Thirteenth Forbearance Amendment), Wells Fargo will immediately advance the full amount of

the Accommodation Overadvance and the amount repaid to the Real Estate Term Advance and

shall restore the Custodial Funds, which shall then be disbursed in accordance with the

instructions provided by the Debtors.

62.     On August 10, 2010, the Company and Wells Fargo entered into the Twenty-First

Forbearance Amendment, which, among other things, addresses the obligation of Wells Fargo to

restore the Custodial Funds.  The Twenty-First Forbearance Amendment provides, in relevant, as

follows:

> (a)     The amount to be restored to the Custodial Account (as defined in the 13th Amendment) by Lender shall be in an amount equal to the lesser of (i) $2,527,556.71, and (ii) that portion of the proceeds of sale of [Ronson Aviation]'s assets (the "RAI Sale") in excess of the amount of the then outstanding Indebtedness due and owing by Obligors immediately prior to the closing of the RAI Sale and attributable to [Ronson Aviation] (such amount being referred to as the "Restored Custodial Funds");

> (b)     Immediately prior to the closing of the RAI Sale, Lender shall make an Advance to [Consumer Products] (the "RCPC Advance") directly into the Custodial Account in an amount equal to the amount of the Restored Custodial Funds;

> (c)     The payoff amount to be received by Lender upon the closing of the RAI Sale shall be the total amount of the then outstanding Indebtedness due and owing by Obligors on such date (which for purposes of clarity shall include the amount of the RCPC Advance, plus all other amounts due and owing to Lender by Obligors upon the closing of the RAI Sale) (the "Payoff Amount");

19

(d)      Upon receipt by Lender of the Payoff Amount, Lender shall apply the Payoff Amount to the repayment in full of all Indebtedness due and owing to Lender by the Obligors (including the amount of the RCPC Advance);  and

(e)      The Restored Custodial Funds shall be returned to [RCLC] and [Consumer Products] immediately after the receipt by Lender of the Payoff Amount, subject to payment of any ordinary and customary fees and expenses associated with maintaining the Custodial Account, upon request and in accordance with instructions provided to Lender by Obligors consistent with this Amendment.

**G.**    **The Termination of the Debtors' Retirement Plan and the Settlement of Litigation Commenced by the PBGC**

63.      On or about December 30, 2009, the Pension Benefit Guaranty Corporation (the "PBGC") commenced a lawsuit (the "Plan Termination Action") in the United States District Court for the District of New Jersey against, among others, the Debtors.  Pursuant to the Plan Termination Action, the PBGC sought entry of a decree (a) adjudicating that the Ronson Corporation Retirement Plan (the "Plan") be terminated, (b) appointing the PBGC as the statutory trustee of the Plan, (c) establishing December 30, 2009 as the termination date of the Plan and (d) directing the Company and any other person or entity having possession, custody or control of any records, assets or other property pertaining to the Plan to transfer, convey and deliver them to the PBGC.  The PBGC also alleged in connection with the Plan Termination Action that the Plan was only 33% funded, with assets of $2.7 million to cover benefit liabilities of $8.2 million and, as such, the PBGC would be entitled to assert claims, including claims that would be secured, against the Debtors for the purported $5.5 million shortfall.

64.      The Debtors spent extensive time negotiating a settlement of the Plan Termination Action and related issues with the PBGC.

65.      On July 12, 2010, RCLC and certain of its subsidiaries (including Consumer Products and Ronson Aviation) entered into a settlement agreement (the "PBGC Settlement

20

Agreement") with the PBGC to settle the Plan Termination Action.  In connection with the

settlement, the parties also entered into an Agreement for Appointment of Trustee and

Termination of Plan (the "Termination Agreement").

66.     Under the terms of the PBGC Settlement Agreement, RCLC and certain of its

subsidiaries, including Consumer Products and Ronson Aviation, as parties, settled the PBGC's

claims against the Debtors, among others, in the aggregate amount of $4,410,361 (the "PBGC

Claim").  The PBGC Claim is comprised of unfunded pension benefit liabilities of $2,508,672,

minimum funding contributions of $258,491 and a termination premium of $1,643,198.  Under

the terms of the Settlement Agreement, the PBGC expressly agreed that the PBGC Claim is an

unsecured non-priority claim, and expressly waived any secured claims against the Debtors.  The

Termination Agreement provides that the Plan is terminated effective December 30, 2009, and

that the PBGC is appointed trustee of the Plan allowing the PBGC to take title to and control

over the Plan assets.  Under the Settlement Agreement, the PBGC acknowledged that a buyer of

the Debtors' assets, including a buyer of the assets of Consumer Products and Ronson Aviation,

will not be deemed a successor and will not have any liability to the PBGC for these claims or to

the Plan so long as any such buyer purchases such assets in an arm's length transaction and is not

an affiliate of the Company or the applicable subsidiaries.

67.     The Company is cooperating with the PBGC to assure the turnover of the Plan

assets and the seamless payment of benefits during the transition period.  Although the PBGC is

now the Plan trustee, the payment of retiree benefits due August 1, 2010 was made from Plan

assets and administered by the Company.  It is anticipated that the benefit payments due for

September and October 2010 will also be administered by the Company.  To the extent that the

PBGC has taken control over the Plan assets, but does not yet have all the information in place to

46726/0001-6923385v1

make benefit payments, the PBGC has advised that it will make funds available to the Company

so that there will not be any delays in benefit payment to the retirees who count on these

payments.

**H.    The Company's Failed Sale to Hawthorne**

68.    As noted above, in conjunction with the retention of its Chief Restructuring

Officer, on March 30, 2009, the Company announced it had initiated plans to divest Ronson

Aviation.

69.    After meeting with several potential suitors interested in acquiring the Ronson

Aviation business, on May 15, 2009, RCLC and Ronson Aviation (collectively, the "Aviation

Sellers") entered into an Asset Purchase Agreement (as amended from time to time, the

"Hawthorne Asset Purchase Agreement") with Hawthorne TTN Holding, LLC ("Hawthorne")

for the sale of substantially all of the assets of the Company's aviation business (other than

specified assets including cash and cash equivalents and accounts receivable).  The Hawthorne

Asset Purchase Agreement provided for a purchase price of $9.5 million in cash, $0.5 million of

which would be held in escrow for a period of fifteen (15) months after closing to secure

indemnification claims against the Aviation Sellers.  Consummation of the transaction with

Hawthorne was subject to, among other things, Hawthorne obtaining necessary financing to

complete the asset purchase, Hawthorne's satisfactory completion of its due diligence review,

RCLC receiving shareholder approval to complete the transaction and the agreement of Mercer

County, New Jersey to the transfer to Hawthorne of the premises used for the Company's fixed

base operation as well as other customary closing conditions.

70.    After the due diligence period and financing contingency expired, RCLC, through

a proxy and solicitation process, sought shareholder approval for the Aviation Sellers to

consummate the transactions contemplated by the Hawthorne Asset Purchase Agreement.

71.    At the Special Meeting of Shareholders (held on February 1, 2010), the Aviation
Sellers received shareholder approval to sell the aviation business to Hawthorne consistent with
the terms of the Hawthorne Asset Purchase Agreement.

72.    The Aviation Sellers expected (and were led to believe by Hawthorne and its
professionals) that a transaction would close shortly after the Special Meeting of Shareholders,
and the Aviation Sellers were prepared and committed to do so.  Indeed, for the next several
months, the Aviation Sellers remained ready, willing and able to close a transaction with
Hawthorne on the terms set out in the Hawthorne Asset Purchase Agreement, and remained
patient with Hawthorne during that time to allow Hawthorne to resolve issues it had in
connection with its financing arrangements (even though its financing contingency had long
since expired).

73.    In fact, on April 23, 2010, the Aviation Sellers entered into an amendment to the
Hawthorne Asset Purchase Agreement with Hawthorne extending the closing date for
completion of the sale of Ronson Aviation's assets to Hawthorne to April 30, 2010 (the
"Hawthorne Amendment").  The Hawthorne Amendment also provided that the Company would
be permitted to offer to sell Ronson Aviation to other potential purchasers and, in addition,
eliminated the $400,000 termination fee otherwise payable to Hawthorne in the event the
Aviation Sellers contracted to sell the assets of Ronson Aviation to a third party.

74.    Thus, in accordance with the Hawthorne Amendment, the Aviation Sellers were
permitted to seek other purchasers for Ronson Aviation.  Though still hopeful that the sale to
Hawthorne would ultimately be completed, because Hawthorne's financing arrangements
continued to be delayed and because Hawthorne was unable to commit to a final closing date,

23

shortly after the Hawthorne Amendment, the Company began investigating its options, including contacting other potential purchasers.

75.    On May 11, 2010, the Company engaged SSG Capital Advisors LLC ("SSG"), an investment banking firm, to, among other things, seek alternative purchasers of Ronson Aviation. Though SSG was in the process of getting the Company back into the market for the aviation business assets and contacting other potential purchasers, the Company continued to focus on closing the transaction with Hawthorne.

76.    As more time passed, however, Hawthorne's willingness or ability to close the transaction became more doubtful.  On May 26, 2010, the Aviation Sellers sent a "time of the essence" letter scheduling a closing on the Hawthorne transaction for June 9, 2010.  Hawthorne failed to appear to close the transaction on that date, in breach of the Hawthorne Asset Purchase Agreement.[7]

77.    On June 23, 2010, the Aviation Sellers sent a letter to Hawthorne terminating the Hawthorne Asset Purchase Agreement and reserving all of its rights and remedies.

## II. <u>FACTORS PRECIPITATING THE DEBTORS' CHAPTER 11 FILINGS</u>

78.    Both Consumer Products and Ronson Aviation suffered declining revenues and increasing operating losses during 2008 and 2009.  The Company attributes these losses and its financial difficulties, in part, to a reduction in consumer spending during this country's economic downturn since 2008, exacerbated by rapidly increasing cost of goods sold.  As described below, in an effort to adjust to this difficult environment, the Company sought to control expenses, pare

---

[7] Hawthorne sent a letter dated June 9, 2010, to the Aviation Sellers purporting to terminate the Hawthorne Asset Purchase Agreement.  Inasmuch as the Aviation Sellers were ready, willing and able to close and all contingencies to the Hawthorne Asset Purchase Agreement had been met or waived, Hawthorne's attempt to terminate the Hawthorne Asset Purchase Agreement lacked any merit, and simply confirmed Hawthorne's inability to close and its default under the terms of the Hawthorne Asset Purchase Agreement.

46726/0001-6923385v1

down staffing levels, and maximize cash flows.  Despite these efforts, these difficulties

understandably negatively impacted the Company's operating results and ultimately resulted in

various covenant defaults under the Prepetition Credit Facility described above, reducing

liquidity and limiting the Debtors' ability to borrow under the Prepetition Revolving Facility or

obtain new financing to fund their operations.

79.    For instance, for the fiscal year ending December 31, 2008, the consumer

products business generated net revenues of approximately $12.5 million, down approximately

9.8% from the prior year.  The decline in revenues was caused by a confluence of factors

including, but not limited to: (i) a severe underutilization of the Company's production facility in

Woodbridge, New Jersey and (ii) the dramatic increase in the price and overall volatility of oil

prices during this period.  The underutilization of Ronson's production facility was attributable

to the economic climate in late 2008 and early 2009 and the resulting decrease in the Company's

revenues, which then caused the Company's liquidity shortfall under its Prepetition Revolving

Facility, negatively impacting its ability to meet its day-to-day cash needs and properly source

component parts required for production in order to satisfy orders of its customers.

80.    The Company's aviation business also faced certain operational and financial

challenges due in large part to macroeconomic factors outside of its control and inherent capital

constraints.  Beginning in late 2008 and continuing through 2009, as the economic recession

negatively impacted businesses, it had a direct effect on curtailing corporate travel – especially

travel via private aircraft.  This phenomenon, combined with higher fuel prices, exacerbated the

decline in air travel as reduced corporate and discretionary income reduced funds available for

fuel purchases, further causing a reduction in flights and fuel sales.  Additionally, the Company

faced constrained liquidity in light of the Events of Default under the Prepetition Credit Facility.

46726/0001-6923385v1

81.      To offset these factors, in 2008 and in 2009, the Company took steps to reduce its

costs and expenses.  Certain salaries to officers were reduced.  The Company's officers accepted

reductions in the management incentive compensation totaling $79,000 related to operating

results in 2007 that had been due to be paid in 2008 and $44,000 in management incentive

compensation related to operating results in 2008.  In the first quarter of 2009, the Company

reduced its workforce by about 15 persons, or 17% of the Company's staff.  The Company

reduced certain of the health benefits provided to its employees, and the Company deferred

payment of the Company's contribution to its defined contribution pension plan.  In addition,

certain employees temporarily assumed payment of costs of Company vehicles and costs of life

and other insurance (which has remained in place to date).  All payments to directors of the

Company, including officers who are directors, have been deferred.  The Company continues to

review its costs and expenses in order to implement additional reductions.

82.      Despite these efforts, the Debtors were not able to improve liquidity sufficiently

to operate without the need for financing.  The Debtors nevertheless remain obligated to pursue a

"Liquidity Transaction" under the Forbearance Agreement, and remained committed to doing so.

However, because shareholder approval of the sale to Hawthorne arguably covers only a sale to

Hawthorne under the specific terms of the Hawthorne Asset Purchase Agreement, the Company

will arguably be required to once again file a proxy statement and once again solicit shareholder

approval of a sale of the same assets, albeit to another buyer (even one that the Debtors believe

brings more value).  The cost to obtain the initial shareholder approval of the two sale

transactions exceeded $270,000.00 and took approximately eighteen (18) weeks.  Wells Fargo

and the Company, in the exercise of its reasoned business judgment, determined that it did not

make sense for the Company to incur potentially significant additional costs and delays

associated with pursuing another proxy process, without assurances that the Company will receive the requisite number of shareholders to vote (as the Company's bylaws require that at least an excess of 50% of all shareholders vote in connection with a proposed sale of substantially all of the Company's's assets) to approve the Aviation Sale (as defined below).

83.    Instead, Wells Fargo has committed to funding the Company, provided the Debtors each file a Chapter 11 and pursue an expedited sale process of the Debtors' remaining assets, including those assets used in connection with the aviation business (the "Aviation Sale"). As discussed below, and more fully set forth in the motion seeking approval of DIP Financing, Wells Fargo is willing to provide continued funding pursuant to the terms of the DIP Financing Facility, which includes various sale related milestones.

84.    Concerned that the Company will lack adequate resources to continue the operations of the aviation business in the ordinary course without the financial accommodation set forth in the Prepetition Credit Facility, and without being willing to risk that they will secure enough shareholders to vote for a transaction to a new purchaser, the Debtors determined that a Chapter 11 filing for each of the Debtors, with the requisite funding provided by the DIP Financing Facility, was the most adequate means to preserve and maximize the value of the Debtors' assets for the benefit of all stakeholders.  The cost, time-delay and prospect that a sufficient number of shareholders might not cast ballots led the Board to conclude that a 363 sale was a less costly method and more efficient than once again soliciting shareholder approval.

85.    That commencement of these bankruptcy cases is, however, not the commencement of a sale process.  As alluded to above, that sale process has been underway for several months.

86.     Indeed, in the ensuing weeks following SSG's engagement, SSG identified and contacted the top industry constituents who would be in a position to move quickly.[8]  SSG contacted ten (10) potential strategic and financial buyers.  Concurrently, management contacted a significant number of additional potential strategic and financial buyers known to it.  Of those parties, ten (10) executed confidentiality agreements, received the information memorandum and gained access to a financial, operational and environmental due diligence managed by SSG and management.  Thereafter, two (2) potential buyers received management presentations or conducted facility tours.

87.     After this initial round of marketing and due diligence, the Debtors received five (5)offers from strategic buyers to pursue a sale transaction involving substantially all of the Ronson Aviation's assets.

88.     After reviewing these offers, RCLC's Board of Directors directed SSG and management to initiate an in-depth diligence process and conduct a final round of bidding.  Two (2) offers were submitted during the final round of bidding, both from strategic buyers.

89.     Between the initial marketing period and first and final rounds of bidding (and without regard to the marketing process that occurred in 2009 before the Company determined to move forward with Hawthorne), interested parties have had nearly four (4) months to review the opportunity and conduct due diligence on Ronson Aviation.

---

[8]Given that a sale process was previously underway prior to SSG's engagement, as outlined in Section H of this Affidavit, and as a result of the failure of that sale process to result in consummated transaction with Hawthorne, SSG immediately began its marketing process to financial and strategic buyers familiar with Ronson Aviation's assets and operations in order to quickly identify a potential buyer that could issue a Letter of Intent and minimize further delay in closing a sale of Ronson Aviation's assets.  Due to the need to quickly identify a potential buyer, SSG approached the likely candidates that could move to issue a Letter of Intent and work towards signing a definitive Asset Purchase Agreement.  The decision to engage a limited number of potential buyer candidates was necessitated by the Debtors' liquidity restrictions, and was supported by Wells Fargo.

90.     After carefully reviewing the final round offers, RCLC's Board of Directors directed management and SSG to negotiate with and assist two (2) bidders to expeditiously secure a fully financed bid and definitively documented sale transaction that maximized the value reasonably obtainable under the circumstances and to continue to work with other bidders who might reasonably be expected to submit a bid in a sale process under Section 363 of the Bankruptcy Code.

91.     After allowing a reasonable time for securing bids that satisfied such criteria and reviewing the status of bids then available for acceptance, RCLC's Board of Directors selected Ross Aviation, Inc., through a newly formed single-purpose entity (the "Ross Aviation Buyer"), to serve as a stalking horse purchaser of substantially all of Ronson Aviation's assets, subject to the negotiation and execution of an asset purchase agreement.  RCLC and Ronson Aviation have entered into an exclusive letter of intent (the "LOI"), which forms the basis for the Ross Aviation Buyer's potential stalking horse bid.  Under the terms of the LOI, RCLC and Ronson Aviation have agreed to sell substantially all of Ronson Aviation's assets to the Ross Aviation Buyer for $9.4 million, subject to certain adjustments and the assumption of certain limited liabilities, including what the Debtors' estimate will be all current ordinary course trade obligations of Ronson Aviation and certain accrued obligations to Ronson Aviation's employees.

92.     Upon the signing and filing of a definitive Asset Purchase Agreement (and the expiration of the exclusivity period with the Ross Aviation Buyer, which expires August 26, 2010), and consistent with the terms therein, SSG will recommence a comprehensive marketing process to solicit higher and better offers for Ronson Aviation's assets.

93.     Wells Fargo has agreed to extend the DIP Financing Facility to the Debtors to support the Debtors' operations during the sale process, consistent with the terms of a budget

which is expected to meet Chapter 11 administrative claims incurred through a closing.  The

proposed DIP Financing Facility will be paid in full and terminated following the closing of the

sale to the Ross Aviation Buyer (or any alternative purchaser).

94.      Given the Debtors' severe liquidity constraints, I understand that RCLC's Board

of Directors believes that the pursuit of an expedited sale process involving substantially all of

Ronson Aviation's assets is the best option for maximizing the value of the Debtors' estates and

is in the best interest of the Debtors' creditors and other parties in interest.

95.      Thus, the Debtors have determined to file for Chapter 11 relief.

### III. FACTS IN SUPPORT OF FIRST DAY MOTIONS

96.      In furtherance of the restructuring efforts, including the pursuit of the Aviation

Sale, the Debtors filed these bankruptcy cases and expect to file a number of First Day Motions.

I have reviewed each of the First Day Motions and proposed forms of order relating thereto (and

the exhibits attached thereto) and the facts set forth therein are true and correct to the best of my

knowledge, information, and belief.[9]  Moreover, I believe that the relief sought in each of the

First Day Motions has been designed to meet the goals of: (a) enabling the Debtors to make the

transition to, and operate in, Chapter 11 with a minimum interruption or disruption to Aviation's

business or loss of productivity or value, while the Debtors pursue the Aviation Sale; (b)

maintaining the confidence and support of customers, employees, vendors and service providers

and certain other key constituencies; (c) allowing the Debtors to have sufficient liquidity to

operate the Aviation business through the Aviation Sale; and (d) establishing procedures for the

smooth and efficient administration of these Chapter 11 cases.  I have reviewed each of the First

Day Motions and I believe that the relief sought in each of the First Day Motions is necessary to

_____

[9] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the relevant First Day Motion and/or accompanying Order.

46726/0001-6923385v1

avoid immediate and irreparable harm to the Debtors and their estates and is tailored to meet the

goals described above.

**A.** **The Case Administration Motions**

(1) Joint Administration

97. These Chapter 11 cases involve three (3) affiliated Debtors. Many, if not most, of

the motions, applications and other pleadings that will be filed in these cases will relate to relief

sought by all of the Debtors. The Debtors, therefore, seek joint administration of their Chapter

11 cases for procedural purposes only. I am advised by counsel that jointly administering these

Chapter 11 cases will: (a) ease the administrative burden on the Court and parties in interest,

(b) protect creditors of different estates, and (c) simplify the United States Trustee's supervision

of the administrative aspects of these Chapter 11 cases.

98. For these reasons, the Debtors believe, and I agree, that joint administration of the

Debtors' Chapter 11 cases is in the best interest of the Debtors, their estates and creditors and

will reduce the administrative burden on the Court and all parties in interest, and therefore,

should be granted.

(2) Extension of Time to File Schedules and Statements

99. Because of (a) the size and scope of the Debtors' businesses, (b) the limited

staffing available to perform the required internal review of its accounts and affairs and (c) the

press of business incident to the commencement of these Chapter 11 cases, the Aviation Sale and

other public reporting requirements, the Debtors were unable to assemble, prior to the Filing

Date, all of the information necessary to complete and file the required schedules of assets and

liabilities, a schedule of current income and expenditures, a schedule of executory contracts and

unexpired leases and a statement of financial affairs (collectively, the "Schedules and

Statements"). Accordingly, the Debtors will seek the entry of an order extending by thirty (30)

days, until September 30, 2010, the date by which the Schedules and Statements must be filed

pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure.

**B.**     <u>**The Employee Wage and Benefit Motion**</u>

        100.     As set forth above, the Debtors' current workforce includes approximately thirty-

four (34) full-time and part-time Hourly and Salaried Employees (at RCLC and Ronson

Aviation).

        101.     The Debtors seek the relief set forth in this Motion to: (a) minimize the personal

hardship that the Debtors' Employees will suffer if the prepetition Employee Related Claims are

not paid when due or as expected; (b) maintain the morale of the Employees during this critical

time; and (c) provide competency and consistency to the Debtors' operations during the sale

process.  The Debtors believe, and I agree, without this consistency the Debtors' operations will

be negatively impacted and the value of their assets will decline.

        102.     Any delay or disruption in the provision of employee benefits or the payment of

compensation (including the payment of prepetition compensation, prepetition benefits and

withholdings and payment of amounts on account of employee payroll deductions (collectively,

the "Prepetition Employment Payments")) will undoubtedly destroy the Debtors' relationships

with the Employees and irreparably impair workforce morale at the very time when the

dedication, confidence and cooperation of the Employees are most critical.  At this critical early

stage, the Debtors simply cannot risk the substantial disruption of business operations that would

inevitably result from any decline in workforce morale attributable to the Debtors' failure to

make Prepetition Employment Payments in the ordinary course of its businesses.

        103.     Accordingly, the Debtors will seek the entry of an order authorizing the Debtors,

in accordance with its stated policies (as such policies may be modified from time to time) and in

the Debtors' sole discretion, to, among other things, pay (a) Prepetition Employment Payments

that accrued but remained unpaid as of the Filing Date to or for the benefit of its Employees and

(b) costs and expenses incident to the Prepetition Employment Payments.

## C.     <u>The Cash Management Motion</u>

104.     The Debtors utilize a cash management system (the "Cash Management System")

in the day-to-day operation of their businesses.  To avoid disruptions in its access to cash, and to

comply with the obligation to maintain the current Cash Management System set forth in the

proposed DIP Facility with Wells Fargo, the Debtors have requested that the Court authorize the

continued use of the Cash Management System.

105.     The Cash Management System constitutes a customary and essential business

practice.  The Cash Management System is similar to those commonly employed by corporate

enterprises comparable to the Debtors in size and complexity.

106.     The Cash Management System is carefully managed through oversight

procedures and controls implemented by the Debtors' treasury department.  Through their

control over the Cash Management System, the Debtors are able to facilitate cash forecasting and

reporting, monitor collection and disbursement of funds, and maintain control over the

administration of various bank accounts required to effect the collection, disbursement, and

movement of cash.

107.     In my opinion, it is both essential and in the best interests of the Debtors'

respective estates and creditors that the Cash Management System be maintained.  Furthermore,

the Debtors' efforts to consummate a sale of its business operations will be facilitated by

preserving the "business as usual" atmosphere and avoiding the distractions that would be

associated with disruptions in the Cash Management System.  Accordingly, the Debtors

respectfully request that the Court authorize their continued use of the Cash Management

System.

46726/0001-6923385v1

108.    For the same reasons, the Debtors seek authority to continue using their existing

business forms.[10]

**D.**    **Motion to Honor Fuel Held for Customer Account**

109.    In connection with Ronson Aviation's ordinary sales practices, Ronson Aviation

permits certain of its customers to pre-purchase fuel, which is then held by Ronson Aviation for

the customer's account.  This practice is customary for FBOs.  Although fuel held for the

customer account does not constitute property of Ronson Aviation (in that it has already been

sold), it is not segregated from Ronson Aviation's fuel supply.  Rather, Ronson Aviation

maintains a record of the amounts of fuel held for such customer, which amounts are reduced

each time a customer's plane is fueled.

110.    As of the Filing Date, Ronson Aviation was holding 10,429 gallons of jet fuel and

840 gallons of 100LL fuel for the account of six (6) customers (the "Held Fuel").

111.    The success and viability of Ronson Aviation's business is dependent in large

measure upon the loyalty and confidence of its customers.  The continued support of this

constituency is absolutely essential to the survival of Ronson Aviation's business and in the

preservation of the value of its estate.  The ability to honor the customer's right to draw upon the

Held Fuel and fulfill customers' future fuel orders is critical at this stage of the Debtors' cases,

while they pursue the Aviation Sale.  In order to preserve going-concern value and maximize the

value of their assets for the benefit of all creditors, the Debtors must maintain continuity of

operations and uphold their reputation for high quality customer service.  This critical need to

---

[10] The Debtors have already incurred the expense of conforming its business forms
relating to the RCLC and Consumer Products to comply with the obligations under the
Consumer Products Purchase Agreement.  Forcing the Debtors to incur additional costs would
also be prohibitive and unnecessary in light of the limited nature of the operations conducted by
each of RCLC and Consumer Products.

preserve customer confidence and loyalty requires that the Debtors be authorized to honor the customer's right to draw upon the Held Fuel after the Filing Date.

112.    Accordingly, the Debtors will seek the entry of an order authorizing Ronson Aviation, in its sole discretion, to honor the customer's right to draw upon the Held Fuel in the ordinary course of Ronson Aviation's business in the same manner and on the same terms and conditions as such obligations were treated prior to the Filing Date.

**E.    Motions and Applications Relating to Professionals**

(1)    Professional Retention Applications

113.    The retention of certain Chapter 11 professionals is essential to the Debtors' efforts in these cases.  Accordingly, concurrently with, or shortly after, the filing of these Chapter 11 cases, the Debtors will seek to retain various professionals to represent and assist them.  These professionals include: (a) Cole, Schotz, Meisel, Forman & Leonard, P.A., as counsel, (b) Szaferman, Lakind, Blumstein & Blader, P.C., as special transactional counsel in connection with the Aviation Sale, (c) McCarter & English, as special corporate and securities counsel, (d) SSG, as investment banker, and (e) Demetrius & Company, LLC, as auditors.  The Debtors believe that (i) the foregoing professionals are well qualified to provide the services contemplated by their various retention applications; (ii)  the services to be provided by the foregoing professionals are necessary for the Debtors' objectives in these cases; and (iii) the foregoing professionals will coordinate their services to minimize any duplication of effort.  The Debtors may find it necessary to seek to retain additional professionals to assist them as the Chapter 11 cases progress.

(2)    Interim Compensation

114.    To permit the Debtors to closely monitor the costs of administration, maintain a level of cash flow, and implement efficient cash management procedures, as well as to enable the

35

Court and key parties-in-interest to ensure the reasonableness of the compensation and

reimbursement sought pursuant to such procedures on a more regular basis, the Debtors will seek

the entry of an administrative order establishing certain procedures for the interim compensation

of the Debtors' professionals that are consistent with the procedures adopted by courts in this

District for the interim compensation of professionals in other similar-sized Chapter 11 cases.[11]

## F.    DIP Financing and Cash Collateral

115.    The Debtors do not have sufficient sources of working capital, including cash

collateral, to operate their business while they implement a Section 363 sale process.  Indeed, the

Debtors' ability to obtain sufficient working capital to operate through an auction and closing is

critical to preserving the Debtors' ongoing concern value and maximizing the value of the

Debtors' assets for the benefit of the Debtors estates and creditors.

116.    Consequently, the Debtors seek entry of an interim and final order authorizing the

Debtors to obtain secured postpetition financing (the "DIP Financing") from Wells Fargo (the

"DIP Lender") on a senior secured basis (the "DIP Facility").  Subject to the approval of this

Court, the Debtors propose to enter into the DIP Facility and to use Cash Collateral, as such term

is defined in Section 363(a) of the Bankruptcy Code.

117.    The DIP Lender is providing the DIP Facility to fund the Debtors' Chapter 11

Cases after financing the Debtors' prepetition restructuring efforts through twenty-one (21)

forbearance periods.  Wells Fargo and Getzler Henrich are consenting to the priming of their

liens in exchange for certain adequate protection concessions, all as set forth more fully in the

motion to approve the DIP Facility and Financing Orders.

---

[11] The Debtors will bring this Motion on regular notice.

118.    As more particularly described in the DIP motion, the DIP Facility includes certain "Extraordinary Provisions" as highlighted by the Bankruptcy Court's General Order Adopting Guidelines for Financing Requests dated November 25, 2009, including

- waivers and concessions of as to the validity of the Prepetition Lenders' liens and claims, subject to a challenge period that expires September 30, 2010.

- provisions that restrict the Debtors' or a Creditors Committee's ability to file certain requests for relief from the Court, including motions to grant a junior post-petition liens (without the consent of the DIP Lender and the Prepetition Lenders), or to obtain future use of cash collateral upon an Event of Default.

- a waiver of Section 506(c) of the Bankruptcy Code, and such waiver without any carve-out for expenses under Section 726(b) of the Bankruptcy Code.

- the Debtors' right to use cash collateral shall cease, and the DIP Facility shall be in default, upon the occurrence of certain events, including without limitation,

  - the filing of a challenge to the Wells Fargo's prepetition liens or to the Wells Fargo's prepetition conduct;

  - a "Change in Control";

  - the filing of a plan of reorganization not supported by Wells Fargo or the Lender; and

  - appointment of a trustee or an examiner.

- the Lender's commitment to advance funds and Wells Fargo's consent to the Debtors' use of cash collateral terminates without providing at least seven (7) days' notice to the Debtors and the Creditors' Committee before the automatic stay terminates and the Lender's and Wells Fargo's remedies can be enforced.

46726/0001-6923385v1

119.    Although Wells Fargo is limiting lending under the DIP Facility to the borrowing base assets, Wells Fargo is making significant additional funds available to the Debtors by providing the overadvance.  Therefore, assuming that the DIP Facility and all of the "Extraordinary Provisions" are approved, the DIP Facility will provide the Debtors with crucial liquidity to fund their operations during the Chapter 11 cases.  Advances under the DIP Facility will be available to each of the Debtors consistent with the terms of the DIP Credit Agreement (which limits borrowings to borrowing base assets) set forth in the DIP Credit Agreement, the DIP Order, which includes the obligation to comply with an agreed upon budget, and prior to the occurrence of the date on which the Final Financing Order (as defined in the DIP Facility) is entered, the aggregate commitments available to the Debtors under the DIP Facility shall be limited to no more than $2,700,000 at any time outstanding, together with an Accommodation Overadvance Limit up to $2,450,000.  The amounts under the DIP Facility will be available for the Debtors' working capital needs, payment of expenses of the Company in these bankruptcy cases (including professional fees and expenses) and repayment of the outstanding and unpaid obligations under the Revolving Credit Facility.

120.    The DIP Facility will mature on the earliest of (i) the entry of the Final Financing Order, (ii) August 31, 2010, if the Final Financing Order has not been entered by that date, (iii)  October 1, 2010, which may be extended solely at the option of the Lender in writing, without the need for any further Court approval or as otherwise set forth in the DIP Loan Documents, or (iv) the occurrence of an Event of Default under the DIP Loan Documents.

121.    Advances under the DIP Facility will bear interest at the same rates currently in effect under the Prepetition Credit Facility (i.e., prime + 3½% with respect to advances under the Revolving Credit Facility and prime + 8% for any Accommodation Overadvances).

46726/0001-6923385v1

122.    The Debtors' ability to obtain advances under the DIP Facility is subject to, among other things, compliance with certain milestones for a sale of substantially all of the Ronson Aviation's assets pursuant to Section 363 of the Bankruptcy Code including the Debtors' entry into a Stalking Horse Agreement on or before August 26, 2010; (i) the Sale Transaction Motion filed and approved by the Bankruptcy Court on or before August 31, 2010; (ii) the Freeholders of the County of Mercer, New Jersey shall have approved the assignment of that certain lease between RAI, as lessee, and County of Mercer, as lessor, dated May 14, 1975, as amended, as more particularly described in the Mortgage, to the proposed purchaser under the Sale Transaction Agreement on or before September 7, 2010; (iii) an auction with respect to the Sale Transaction and filed a motion to approve the sale of all of the Borrower's assets pursuant to Section 363(b) of the Bankruptcy Code on or before September 27, 2010; (iv) the Bankruptcy Court shall have entered the Sale Order on or before September 29, 2010; and (v) the Sale Transaction shall be consummated pursuant to the terms of the applicable Sale Transaction Agreement on or before October 1, 2010.

123.    The Debtors and SSG believe that a sale which maximizes value can be achieved with in the timeframes set forth in the DIP Facility.  As noted above, the Ronson Aviation assets were extensively marketed prior to the Filing Date.  The Debtors and SSG believe that most, if not all, purchasers capable of meeting the Company's objectives for the Aviation Sale under the timeframe set forth in the DIP Facility were previously identified and contacted prior to the Filing Date.  Any prospective purchaser who expressed interest and signed a confidentiality agreement was given access to all relevant information and an opportunity to make offers for the assets.  In light of the prepetition sale process, it is not likely that a longer post-petition sale period would yield additional offers.  A sale under the timeframes provided for in the DIP

Facility will maximize value while minimizing the additional operating and Chapter 11 administrative costs that a longer sale process would require, which benefits all stakeholders in these Chapter 11 cases.

124.    The Debtors do not have sufficient sources of working capital, including cash collateral, to operate their business while they implement a sale process without the DIP Financing offered by the DIP Lender (and the Prepetition Lenders' concurrent authority for the Debtors to use Cash Collateral).  Due to their financial condition, the Debtors were not able to procure sufficient financing from an alternative lender on more favorable terms than those that govern the DIP Facility.

125.    The Debtors' ability to continue operating is critical to preserving Ronson Aviation's going concern value and ensuring that the value of the Debtors' assets is maximized for the benefit of the Debtors' estates and creditors.  The Debtors, their employees and estates will suffer irreparable harm if the DIP Facility is not approved and if the Debtors do not obtain the working capital they need to consummate a sale of the aviation business as a going concern.

/s/ *Daryl K. Holcomb*
DARYL K. HOLCOMB

Sworn and subscribed to
before me this 17th day of
August 2010


    /s/ *Ira Keith Gordon*
Ira Keith Gordon
Notary Public, State of New Jersey
My Commission Expires
November 2, 2010