**COLE, SCHOTZ, MEISEL,**
**FORMAN & LEONARD, P.A.**
A Professional Corporation
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, New Jersey 07602-0800
Michael D. Sirota, Esq.
David M. Bass, Esq.
(201) 489-3000
(201) 489-1536 Facsimile
Proposed Attorneys for RCLC, Inc., *et al.*,
Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY
CASE NO. 10-35313 (MBK)

|  |  |
|---|---|
| In re:<br><br>RCLC, Inc. f/k/a Ronson Corporation, *et al.*,<br><br>            Debtors-in-Possession. | Chapter 11<br><br>(Jointly Administered)<br><br>**HEARING DATE AND TIME:**<br>September 30, 2010, at 11:00 a.m.<br><br>**ORAL ARGUMENT REQUESTED** |

**VERIFIED APPLICATION IN SUPPORT OF THE DEBTORS' MOTION FOR AN
ORDER AUTHORIZING SALE OF ALL OR SUBSTANTIALLY ALL ASSETS OF
RONSON AVIATION, INC. TO TRENTON AVIATION, LLC FREE AND CLEAR OF
ENCUMBRANCES, AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION THEREWITH AND GRANTING OTHER, RELATED RELIEF**

TO:    HONORABLE MICHAEL B. KAPLAN
       United States Bankruptcy Judge

       Ronson Aviation, Inc. (the "Seller" or "Ronson Aviation") and RCLC, Inc. ("Parent" and

together with Ronson Aviation, the "Debtors"), two of the within debtors and debtors-in-

possession[1] hereby submit this motion (the "Motion"), pursuant to sections 105(a) and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") for entry of an order, substantially in the form submitted herewith (the "Sale Order"), (i) authorizing the sale (the "Sale") of substantially all of Ronson Aviation's assets (as defined in the Purchase Agreement, hereinafter the "Assets") to the Trenton Aviation, LLC (the "Purchaser") free and clear of liens, claims, encumbrances, and interests, pursuant to that certain Asset Purchase Agreement dated August 27, 2010, by and among the Debtors and the Purchaser (the "Purchase Agreement"), a copy of which is attached hereto as **Exhibit A**, subject to a higher or otherwise better bid, (ii) authorizing the assumption, sale and assignment of certain executory contracts and unexpired leases (the "Assumed Aviation Contracts") and (iii) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.    In the several months preceding the Debtors' Chapter 11 filings, the Debtors and their investment banker, SSG Capital Advisors, LLC ("SSG"), aggressively pursued a potential sale of substantially all of the assets of the Ronson Aviation business as a going concern.  During the last two months, discussions intensified with several parties.  However, one of those parties, Trenton Aviation, LLC, a subsidiary of an experienced FBO operator, has stepped to the forefront and is prepared to perform in accordance with a "stalking horse" agreement that, subject to higher or better offers that may be made during the Sale Process (as defined below),

---

[1] The other debtor and debtor-in-possession in these jointly administered proceedings, RCPC Liquidating Corp. f/k/a Ronson Consumer Products Corporation ("Consumer Products" and together with the Debtors, the "Company") is not a party to the Purchase Agreement (as defined below) and not selling any assets.

will enable the Debtors to maximize the value of Ronson Aviation's assets.  This Motion is the

logical last step in wrapping up an extensive, comprehensive marketing process.  The sale

transaction set forth in the Purchase Agreement will generate significant sale proceeds to satisfy

claims of the Debtors' secured creditors in full and provide a substantial distribution to

unsecured creditors.  Accordingly, the Debtors believe approval of the transactions contemplated

by the Purchase Agreement, including consummating the Sale to the Purchaser in accordance

with the terms and conditions of the Purchase Agreement (or pursuant to such purchase

agreement of such other party that submits a higher or otherwise better bid), is in the best interest

of all of the Debtors' stakeholders.

## **INTRODUCTION AND JURISDICTION**

2.      On August 17, 2010 (the "Filing Date"), the Debtors, together with Consumer

Products, each filed voluntary petitions for relief under chapter 11 of title 11 of the United States

Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  Each of the Debtors continues in

possession of its property and continues to operate and manage its business as a debtor-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  On August 19, 2010,

the Court entered an order jointly administering the above-captioned cases (the "Chapter 11

Cases").  *See* Docket No. 37.

3.      On August 26, 2010, the Office of the United States Trustee for the District of

New Jersey appointed an Official Committee of Unsecured Creditors (the "Committee") in the

Chapter 11 Cases pursuant to 11 U.S.C. § 1102.

4.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and

157(b).  This is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O).

5.      The statutory predicates for the relief requested herein are Bankruptcy Code

Sections 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004, and 6006.

46726/0001-6974708v2

6.        Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## FACTUAL BACKGROUND[2]

**A.        Overview**

7.        Historically, the Company has been engaged principally in the following businesses: (i) consumer products and (ii) aviation-fixed wing and helicopter services.

8.        RCLC, a New Jersey corporation, is a holding company and does not conduct business operations except through its subsidiary entities.  Ronson Aviation, also a New Jersey corporation, is a wholly-owned subsidiary of RCLC.  Ronson Aviation is the sole remaining operating subsidiary of RCLC.

9.        As more fully described in the Holcomb Affidavit, Ronson Aviation is a full-service Fixed Base Operator (FBO) which operates at the Trenton-Mercer Airport, Trenton, New Jersey.  Ronson Aviation provides a wide range of general aviation services to the general public and to government agencies.  Those services include aircraft fueling, cargo handling, avionics, new and used aircraft sales, aircraft repairs, aircraft storage and office rental.  Ronson Aviation is the sole full-service FBO at Trenton-Mercer Airport.

10.        Ronson Aviation employs twenty-seven (27) employees, four (4) of whom are full-time salaried employees and twenty-three (23) of whom are full-time hourly employees.

11.        Ronson Aviation owns no real property.  Rather, Ronson Aviation leases the property, covering approximately 18.4 acres, from which it conducts its operations pursuant to

---

[2] A more detailed description of the Company's business, background, capital and debt structure, and the circumstances leading to the Chapter 11 filings is included in the Affidavit of Daryl K. Holcomb in Support of the Debtors' Various "First Day Motions" and Entry of an Emergency Interim Order Authorizing Payment of Certain Pre-Petition Payroll and Related Obligations Pending Hearing on "First Day" Motions (the "Holcomb Affidavit") dated August 17, 2010 [Docket No. 9], which is incorporated herein by reference.

the terms of an Agreement and Lease, entered into as of May 14, 1975, with Mercer County (as amended, the "Master Lease").  The annual rent and fees for fuel flowage and landing commissions under the Master Lease is approximately $170,000.  The Master Lease currently expires in 2032.

**B.** **The Debtors' Pre-Petition Debt Structure**

- ***The Prepetition Credit Facility with Wells Fargo***

12.     The Debtors (including Consumer Products) and non-debtor Ronson Corporation of Canada Ltd. (n/k/a RCC Inc.) ("RCC") are parties to a pre-Filing Date senior secured financing facility (the "Prepetition Credit Facility") with Wells Fargo Bank, National Association ("Wells Fargo"), acting through its Wells Fargo Business Credit operating division, governed by the terms of a Credit and Security Agreement dated as of May 30, 2008 (as amended, modified, supplemented or restated from time to time, the "Credit Agreement").  At its inception, the Prepetition Credit Facility consisted of (a) a revolving credit facility in an amount up to $4.0 million (the "Revolving Credit Facility"), and (b) the following term loans: (i) an Equipment Term Advance in the original principal amount of $837,500; and (ii) a Real Estate Term Advance in the original principal amount of $2,922,500.  Consumer Products, Ronson Aviation and non-debtor, RCC, are the "Borrowers" under the Prepetition Credit Facility and RCLC is a guarantor.

13.     Amounts advanced under the Prepetition Credit Facility were secured by substantially all of the assets of the Company and its subsidiaries.[3]

---

[3] Under the terms of the Credit Agreement, Wells Fargo did not have a lien or security interest in either the real property owned by Consumer Products in Woodbridge, New Jersey, which has since been sold, or 34% of the Company's interest in RCC.

14.    Borrowings under the Revolving Credit Facility were subject to a borrowing base tied to the Company's eligible inventory and accounts receivable, and other factors, as set forth in the Credit Agreement.

15.    Under the terms of the Credit Agreement, the term of the Prepetition Credit Facility was 60 months.  The Prepetition Credit Facility provided for LIBOR Advances (except during a Default Period, as such term is defined in the Credit Agreement) and Floating Rate Advances (as such term is defined in the Credit Agreement), payable at such interest rates and at such times as are provided for in the Credit Agreement, and contains minimum tangible net worth, minimum net income, minimum net cash flow and other financial covenants, certain restrictions on capital expenditures, as well as affirmative and negative covenants and events of default typical of transactions of that nature.

16.    On or around May 30, 2008, the Company applied a portion of the proceeds of the Prepetition Credit Facility to pay off its prior credit facility with CIT Group/Commercial Services, Inc., as well as to pay off other debt outstanding to EPIC Aviation, LLC, Bank of the West, and Banc of America Leasing.

- ***Defaults Under the Prepetition Credit Facility and the Forbearance Agreement***

17.    On November 21, 2008, Wells Fargo advised the Company and its subsidiaries that the Company's failure to meet certain financial covenants constituted "Events of Default" under the Credit Agreement.

18.    As a result of the Events of Default, Wells Fargo exercised certain of the rights available to it under the Credit Agreement and reduced the amounts available to be borrowed under the revolving line of credit.  In December 2008, Wells Fargo required that the Company

46726/0001-6974708v2

engage a consultant to review and monitor the Company's operation and Wells Fargo increased
its monitoring of the line of credit.

19.    In December 2008, in response to suggestions from Wells Fargo, the Company's
Board of Directors began interviewing financial consultants to assist the Company in managing
its operations and cash requirements.  On January 6, 2009, the Company engaged Getzler
Henrich & Associates LLC ("Getzler Henrich") as its financial consultant.  Getzler Henrich is a
corporate turnaround and restructuring firm which, in addition to its operational restructuring
focus, is experienced in restructuring, lender/creditor relationship management and financing.

20.    On February 20, 2009, the Company received from Wells Fargo an additional
notification of Wells Fargo's reservation of rights and remedies relating to the previously
identified Events of Default.  The notification further indicated that Wells Fargo acting in
accordance with the Credit Agreement was instituting certain restrictions and reducing the
Debtors' loan availability.

21.    On March 30, 2009, Wells Fargo entered into a forbearance agreement with the
Company under which Wells Fargo agreed not to exercise any of its additional rights and
remedies available as a result of the Events of Default under the Credit Agreement through April
24, 2009, unless earlier terminated in the event the Company, among other things, breached the
forbearance agreement.  Wells Fargo also agreed to provide the Company with an overadvance
facility (*i.e.*, the Accommodation Overadvance) in the amount of $500,000 to supplement the
Company's credit line and enhance its liquidity.  The forbearance agreement was subsequently
amended on numerous occasions to provide, in each case, extensions of the forbearance period
and, in some cases, for additional credit availability (the original agreement together with all
amendments, collectively, the "Forbearance Agreement").  The last amendment to the

Forbearance Agreement, the Twenty-First Amendment to Forbearance Agreement (the "Twenty-First Forbearance Amendment"), was executed as of August 10, 2010, and extended the forbearance period through August 16, 2010.

22.     In connection with the Forbearance Agreement, the Company agreed, among other things, to actively pursue a "Liquidity Transaction".[4]

23.     Without regard to the amounts to be restored to the Custodial Account (as described more fully in the Holcomb Affidavit), as of the Filing Date, outstanding principal obligations under the Prepetition Credit Facility total approximately $3.62 million, plus such amounts as may have accrued for interest and other fees and expenses as of the Filing Date.[5]

- ***The Engagement of Getzler Henrich & Associates LLC, as Chief Restructuring Officer***

24.     On March 30, 2009, as a condition to the Forbearance Agreement, the Company retained Joel Getzler, of Getzler Henrich, as Chief Restructuring Officer, pursuant to the terms of an agreement with Getzler Henrich entered into on March 30, 2009, which supplemented the

---

[4] A Liquidity Transaction is defined in the Forbearance Agreement as follows:

> [A transaction where] Parent and the stockholders of Parent are actively pursuing either a sale of all of the capital stock of RAI or of all or substantially all of the assets of RAI or financing to be provided by another lender (each a "Liquidity Transaction"), in either case in an amount sufficient to enable the Obligors to fully pay and satisfy the Indebtedness …

[5] Without regard to the amounts to be restored to the Custodial Account, as of the Filing Date, the amounts due under the Prepetition Credit Facility are comprised of the following: (i) net advances under the Revolving Credit Facility and amounts necessary to satisfy the Accommodation Overadvance totaling $2,466,926.84; and (ii) principal and interest of $1,153,639.70 on account of the Real Estate Term Advance.  (The Equipment Term Note was repaid from the proceeds of the Zippo Sale and a portion of the Real Estate Term Note was repaid consistent with the Thirteenth Forbearance Amendment, as described [below]).  This sum does not include the amounts due with respect to the Getzler Henrich Fee Agreement (as defined below), which amounts are also part of Wells Fargo's secured claim and will be paid to Wells Fargo from the Sale Proceeds (as defined below).

Company's earlier consulting agreement with Getzler Henrich (collectively, as amended, the "Getzler Henrich Engagement Agreement").  In accordance with the Getzler Henrich Engagement Agreement, Joel Getzler, as Chief Restructuring Officer, was charged with responsibility for the Company's operations, finance, accounting and related administrative issues, subject to the authority of and reporting to the Company's Board of Directors.  A copy of the Getzler Henrich Engagement Agreement and copies of the subsequent amendments thereto are attached hereto collectively as **Exhibit B**.

25.     Mr. Getzler and associates of Getzler Henrich were engaged by the Company on a virtual full-time basis from March 30, 2009, to immediately prior to the Filing Date.

26.     In accordance with the agreement of the parties, as set forth in, among other documents, the Getzler Henrich Engagement Agreement, the Company is obligated for fees and expenses to Getzler Henrich in connection with services provided by Mr. Getzler and his associates.  In addition, Getzler Henrich is entitled to a signing bonus in the amount of $200,000.

27.     A portion of the fees for which the Company was to be (and is now) obligated were to be deferred.  In that regard, the Getzler Henrich Engagement Agreement provides, in relevant part, as follows:

> The balance of the amounts payable under this Agreement, including, without limitation, the Signing Bonus (such amounts, the "Deferred Amount") and the Existing Receivable will be payable in full upon the first to occur (the "Deferred Payment Date") of (i) the consummation of a Transaction; provided, that if both (x) such Transaction has not resulted in proceeds sufficient to satisfy the Company's indebtedness to [Wells Fargo] and (y) the Company is not paying balances due to any other professionals, the Deferred Amount and the Existing Receivable will not be paid upon consummation of a Transaction unless such payment is consented to by [Wells Fargo], or (ii) August 31, 2009.
>
> The payment of the Deferred Amount and the Existing Receivable shall be a condition to the consummation of any such Transaction, and Getzler Henrich shall have the right to inform the other

party(ies) to any such Transaction that payment of the Deferred
Amount and the Existing Receivable is a condition to the
consummation of a Transaction; provided, that except as otherwise
agreed by the Company, Getzler Henrich and [Wells Fargo], if the
Company and [Wells Fargo] consent to a Transaction, the failure
to fully pay the amounts set forth above shall not result in the
Company not being able to consummate such Transaction.[6]

28.    In addition, the Company agreed to provide Getzler Henrich with a security

interest in substantially all of the Company's assets to secure the repayment of Getzler Henrich's

fees.  The Getzler Henrich Engagement Agreement provides, in relevant part, as follows:

> To secure payment of all obligations to Getzler Henrich hereunder,
> including without limitation the Deferred Amount and the Existing
> Receivable, each of the undersigned grants Getzler Henrich a
> security interest in the same assets in which it has granted a
> security interest to [Wells Fargo] (other than [Ronson Aviation's]
> Lease in Mercer County, New Jersey), such security interest to be
> subordinated to the security interest granted to [Wells Fargo]
> pursuant to an intercreditor agreement to be entered into with
> [Wells Fargo] and the undersigned.…

29.    Getzler Henrich filed the following financing statements to perfect its security

interest in the Company's assets granted pursuant to the Getzler Henrich Engagement

Agreement:

---

[6] A "Transaction" under the Getzler Henrich Engagement Agreement is defined as
follows:

> The development of restructuring plans for the Company,
> including, without limitation, restructuring plans involving the
> Company's existing secured debt, a recapitalization of the
> Company, or asset sales, divestitures, liquidations or other
> disposition of assets of the Company, whether as part of or outside
> of any Insolvency Proceeding (any of the foregoing, including
> without limitation a sale or other disposition in whole or in part of
> RAI or the assets thereof …

A payment of $100,000 was made to Getzler Henrich from the proceeds of the sale of the
consumer products business on February 2, 2010.  Getzler Henrich has requested payment of the
Deferred Amount and Existing Receivable as a condition to providing its consent to the Sale.

46726/0001-6974708v2

| JURISDICTION | DEBTOR | COLLATERAL | TYPE OF FILING | FILING DATE | FILING NUMBER |
|---|---|---|---|---|---|
| NJ SOS | Ronson Aviation, Inc. | All present and future assets of the Debtor. | Original | 05/30/2009 | 2517404-5 |
| NJ SOS | Ronson Corporation | All present and future assets of the Debtor. | Original | 03/30/2009 | 25174069 |
| NJ SOS | Ronson Corporation | Specific Collateral Deleted<br>This Amendment releases all of Secured Party's right, title and interest in and to the Collateral described in Addendum to the UCC Financing Statement Amendment which is attached to and made a part of this UCC Financing Statement Amendment. | Amendment to delete collateral. | 02/04/2010 | 25174068 |
| NJ SOS | Ronson Consumer Products Corporation | All present and future assets of the Debtor other than the "Mortgaged Property" as such term is defined in the Mortgage made by the Debtor to North Fork Bank (k/n/a Capital One, N.A.) dated 9/27/06 and recorded with the Clerk of Middlesex County, NJ on 10/10/06 in Mortgage Book 11875, Pg. 534 and re-recorded in the same office on 10/22/2007 in Mortgage Book 12672, Pg. 0459, as modified by the Note and Mortgage Modification Agreement dated 03/26/2008 and recorded 04/08/2008 with the Clerk of Middlesex County, NJ in Book 147 at Pg. 617. | Original | 03/30/2009 | 25174038 |
| NJ SOS | Ronson Consumer Products Corporation | Specific Collateral Deleted<br>The UCC Financing Statement Amendment releases all of Secured Party's right, title and interest in and to the Collateral described in Addendum to the UCC Financing Statement Amendment which is attached to and made a part of this UCC Financing Statement Amendment.<br><br>Types and Items of Property Released:  All of Secured Party's right, title and interest in and to the Business Assets, but only to the extent such Business Assets exist as of the Closing Date under the Purchase Agreement and are sold and transferred by Debtor pursuant to that certain Asset Purchase Agreement dated as of 10/05/2009 between Debtor and Zippo Manufacturing Company and Nosnor, Inc. as in effect on 10/05/2009.<br><br>Nothing herein shall release or be deemed to release any security interest in or lien upon any proceeds from the sale of the Business Assets paid or payable to or for the benefit of Debtor under the Purchase Agreement, or any other assets of Debtor.  The release of Secured Party's security interest in the Business Assets should not be construed to evidence or reflect the payment or satisfaction of any of the indebtedness or other obligations of Debtor or any of its affiliates to Secured Party and is without prejudice to the rights of Secured Party to collect any such indebtedness or other obligations from Debtor and/or from any other persons or entities obligated thereon and/or from any and all other collateral granted to or held by Secured Party. | Amendment to delete specific collateral. | 02/04/2010 | 25174038 |

11

30.     To procure the services of Mr. Getzler and Getzler Henrich, and as a further

assurance to Getzler Henrich that it would be paid its fees in light of the deferral thereof, the

Company and Wells Fargo agreed to the terms of that certain Agreement With Respect to

Payment of Fees and Expenses, by and among Getzler Henrich, Wells Fargo, the Debtors and

RCC Inc., dated March 30, 2009 (the "Getzler Henrich Fee Agreement").  A copy of the Getzler

Henrich Fee Agreement is attached hereto as **Exhibit C**.

31.     The Getzler Henrich Fee Agreement provides, in relevant part, as follows:

>    1.     <u>Payment of Fees and Expenses</u>.  As a condition to Wells
> Fargo consenting to a Transaction (as defined in the Engagement
> Letter), Wells Fargo will, immediately prior to the consummation
> of such Transaction, pay to [Getzler Henrich] the amount by which
> the net proceeds of such Transaction exceed the amount necessary
> to pay Wells Fargo in full (prior to giving effect to such payment)
> (the "Excess Proceeds") up to a maximum amount equal to the
> aggregate of the Deferred Amount and the Existing Receivable (as
> such terms are defined in the Engagement Letter), and the amount
> of such payment to [Getzler Henrich] will be added to the principal
> amount of the loan due and owing by the Company to Wells Fargo
> under the Credit Agreement and shall be repaid to Wells Fargo
> from the proceeds of the Transaction, provided, however, to the
> extent the Excess Proceeds are insufficient to pay [Getzler
> Henrich] at least $100,000 of the Deferred Amount and the
> Existing Receivable, Wells Fargo will pay [Getzler Henrich] the
> difference up to $100,000 (or cause the Company to pay [Getzler
> Henrich] the difference up to $100,000 against the Deferred
> Amount and the Existing Receivable from the amount of the net
> proceeds of the Transaction that otherwise would have been paid to
> Wells Fargo).  Upon receipt of the amounts set forth above,
> [Getzler Henrich] will release the security interest granted to it in
> connection with the assets being sold as part of such Transaction
> (and hereby authorizes Wells Fargo to effect such release if
> [Getzler Henrich] does not upon the request of Wells Fargo or the
> Company), but [Getzler Henrich] will retain its security interest in
> all other assets in which it has been granted a security interest.
> Amounts paid by or for the account of the Company pursuant to
> the foregoing shall first be applied to payment of the Existing
> Receivable, with any excess applied to payment of the Deferred
> Amount.

46726/0001-6974708v2

32.    During the term of the Getzler Henrich Engagement Agreement, payments against accrued amounts, including the signing bonus, have been made to Getzler Henrich in the amount of $10,000 each week.  However, the "Deferred Amount" and the "Existing Receivable" (*i.e.*, the $190,000 owed to Getzler Henrich in fees prior to the appointment of Mr. Getzler as Chief Restructuring Officer), are to become payable upon a "Transaction."  The Sale is a "Transaction" within the meaning of each of the Getzler Henrich Engagement Agreement and the Getzler Henrich Fee Agreement, and will necessitate the payment of all accrued fees to Getzler Henrich.

33.    As of the Filing Date, the Company was indebted to Getzler Henrich in the amount of approximately $2,005,050.59.[7]

C.    **The DIP Financing Facility and the Sale Milestones**

34.    The Debtors have obtained post-petition financing (the "Post-Petition Financing") to support the Debtors' operations during the Sale Process, pursuant to the terms of that certain Debtor-in-Possession Credit and Security Agreement dated as of August 19, 2010 (the "DIP Credit Agreement") and related documents with Wells Fargo (in capacity as a lender pursuant to the DIP Financing Facility, the "DIP Lender") and pursuant to (i) the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364, Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure, and the Court's General Order Adopting Guidelines for Financing*

---

[7] The Company allocated Getzler Henrich's fees for the services it was rendering to the Company.  According to the Company's calculations, $676,000 of the liability to Getzler Henrich should be allocated to Consumer Products and the balance (approximating $1,329,050.59 as of the Filing Date) should be allocated to Ronson Aviation.  Nevertheless, pursuant to the Getzler Henrich Engagement Agreement, each of the Debtors is jointly and severally liable for Getzler Henrich's fees.  The Debtors' internal allocation should have no impact on the Getzler Henrich Fee Agreement and inclusion of the full amount of Getzler Henrich's fees as part of Wells Fargo's secured claim.

*Requests:  (I) Authorizing Debtors to Obtain Postpetition Financing on Superpriority and Secured Basis, (II) Permitting the Use of Cash Collateral, (III) Granting Interim Relief, and (IV) Scheduling a Final Hearing Under Bankruptcy Rule 4001(c)* entered August 19, 2010 [Docket No. 29] (the "Interim DIP Order") and (ii) the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363 and 364, Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure, and the Court's General Order Adopting Guidelines for Financing Requests: (I) Authorizing Debtors to Obtain Postpetition Financing on Superpriority and Secured Basis, and (II) Permitting the Use of Cash Collateral* (the "Final DIP Order" and together with the DIP Credit Agreement, such other related documents and the Interim DIP Order, the "DIP Financing Facility").

35.     The DIP Financing Facility provides that the Post-Petition Financing, including the use of Wells Fargo's cash collateral, terminates if, among other reasons, the Debtors fail to comply with the following "Sale Transaction Schedule" milestones.  Among other requirements, the DIP Financing Facility requires the entry of the Sale Order on or before September 30, 2010, and a closing on or before October 15, 2010.[8]

36.     In furtherance of the Sale and in accordance with the requirements of the DIP Financing Facility, the Debtors moved the Court for entry of an order approving certain bidding procedures for an auction of substantially all of Ronson Aviation's assets (the "Bidding Procedures Motion").  *See* Docket No. 58.  On September 8, 2010, the Court entered the *Order: (1) Approving the Form of "Stalking Horse" Asset Purchase Agreement for the Sale of All or*

---

[8] The DIP Financing Facility originally required a closing on or before October 1, 2010. Subsequent to the Debtors' entry into the DIP Financing Facility, the Debtors negotiated an extension of the closing date, *i.e.*, to October 15, 2010, which is memorialized in the Final DIP Order.

*Substantially All of Assets of Ronson Aviation, Inc.; (2) Approving Bidding Procedures and*

*Form, Manner and Sufficiency of Notice; (3) Scheduling (A) an Auction Sale and (B) a Hearing*

*to Consider Approving the Highest or Best Offer; (4) Approving the Form of Notice of the*

*Assumption and Assignment of Certain Executory Contracts And Unexpired Leases and of*

*Associated Cure Amounts, and (5) Granting Other Related Relief* (the "Bidding Procedures

Order"), approving the Bidding Procedures Motion.  *See* Docket No. 71.  Among other things,

the Bidding Procedures Order established certain participation requirements and procedures for

bidders interested in purchasing the Assets (as set forth in the Bidding Procedures Order, the

"Bidding Procedures").  Additionally, the Bidding Procedures Order establishes certain dates and

deadlines, including the following: (i) a Bid Deadline (as defined in the Bidding Procedures

Order) of September 24, 2010, at 12:00 p.m. (prevailing Eastern time); (ii) an Auction (as

defined in the Bidding Procedures Order) to be held on September 27, 2010 at 10:00 a.m.

(prevailing Eastern time) and (iii) a Sale Approval Hearing (as defined in the Bidding Procedures

Order) to be held on September 30, 2010 at 11:00 a.m. (prevailing Eastern time).

D.    **The Prepetition Efforts to Sell Ronson Aviation**

37.    In conjunction with the retention of its Chief Restructuring Officer, and consistent

with the requirements of the Forbearance Agreement to pursue a "Liquidity Transaction", on

March 30, 2009, the Company announced it had initiated plans to divest Ronson Aviation.[9]

38.    After meeting with several potential suitors interested in acquiring the Ronson

Aviation business, on May 15, 2009, RCLC and Ronson Aviation (collectively, the "Aviation

---

[9] Later in 2009, the Company also determined to sell its consumer products division.  As
more fully set forth in the Holcomb Affidavit, in February 2010, the Company sold its consumer
products business to Zippo Manufacturing Company and Nosnor, Inc. (collectively, "Zippo").
Consumer Products, therefore, has no assets that it is proposing to sell in these Chapter 11 Cases
and thus, this Motion does not pertain to Consumer Products.

Sellers") entered into an Asset Purchase Agreement (as amended from time to time, the "Hawthorne Asset Purchase Agreement") with Hawthorne TTN Holding, LLC ("Hawthorne") for the sale of substantially all of the assets of the Company's aviation business (other than specified assets including cash and cash equivalents and accounts receivable). The Hawthorne Asset Purchase Agreement provided for a purchase price of $9.5 million in cash, $0.5 million of which would be held in escrow for a period of fifteen (15) months after closing to secure indemnification claims against the Aviation Sellers. Consummation of the transaction with Hawthorne was subject to, among other things, Hawthorne obtaining necessary financing to complete the asset purchase, Hawthorne's satisfactory completion of its due diligence review, RCLC receiving shareholder approval to complete the transaction and the agreement of Mercer County, New Jersey to the transfer to Hawthorne of the premises used for the Company's fixed base operation as well as other customary closing conditions.

39.    After the due diligence period and financing contingency expired, RCLC, through a proxy and solicitation process, sought shareholder approval for the Aviation Sellers to consummate the transactions contemplated by the Hawthorne Asset Purchase Agreement.

40.    At a special meeting of shareholders held on February 1, 2010 (the "Special Meeting of Shareholders"), the Aviation Sellers received shareholder approval to sell the aviation business to Hawthorne consistent with the terms of the Hawthorne Asset Purchase Agreement. The Debtors also obtained Mercer County's consent to an amendment to the Master Lease, which amendment would have permitted the assignment of the Master Lease to Hawthorne.

41.    The Aviation Sellers expected (and were led to believe by Hawthorne and its professionals) that a transaction would close shortly after the Special Meeting of Shareholders,

and the Aviation Sellers were prepared and committed to do so.  Indeed, for the next several months, the Aviation Sellers remained ready, willing and able to close a transaction with Hawthorne on the terms set out in the Hawthorne Asset Purchase Agreement, and remained patient with Hawthorne during that time to allow Hawthorne to resolve issues it had in connection with its financing arrangements (even though its financing contingency had long since expired).

42.     In fact, on April 23, 2010, the Aviation Sellers entered into an amendment to the Hawthorne Asset Purchase Agreement with Hawthorne extending the closing date for completion of the sale of Ronson Aviation's assets to Hawthorne to April 30, 2010 (the "Hawthorne Amendment").  The Hawthorne Amendment also provided that the Company would be permitted to offer to sell Ronson Aviation to other potential purchasers and, in addition, eliminated a $400,000 termination fee otherwise payable to Hawthorne in the event the Aviation Sellers contracted to sell the assets of Ronson Aviation to a third party.

43.     Thus, in accordance with the Hawthorne Amendment, the Aviation Sellers were permitted to seek other purchasers for Ronson Aviation.  Though still hopeful that the sale to Hawthorne would ultimately be completed, because Hawthorne's financing arrangements continued to be delayed and because Hawthorne was unable to commit to a final closing date, shortly after the Hawthorne Amendment, the Company began investigating its options, including contacting other potential purchasers.

44.     On May 11, 2010, the Company engaged SSG, an investment banking firm, to, among other things, seek alternative purchasers of Ronson Aviation.  Though SSG was in the process of getting the Company back into the market for the aviation business assets and

46726/0001-6974708v2

contacting other potential purchasers, the Company continued to focus on closing the transaction

with Hawthorne.

45.    As more time passed, however, Hawthorne's willingness or ability to close the

transaction became more doubtful.  On May 26, 2010, the Aviation Sellers sent a "time of the

essence" letter scheduling a closing on the Hawthorne transaction for June 9, 2010.  Hawthorne

failed to appear to close the transaction on that date, in breach of the Hawthorne Asset Purchase

Agreement.

46.    On June 23, 2010, the Aviation Sellers sent a letter to Hawthorne terminating the

Hawthorne Asset Purchase Agreement and reserving all of their rights and remedies.

47.    The Debtors nevertheless remained obligated to pursue a "Liquidity Transaction"

under the Forbearance Agreement, and remained committed to doing so.  However, because

shareholder approval of the sale to Hawthorne arguably covered only a sale to Hawthorne under

the specific terms of the Hawthorne Asset Purchase Agreement, the Company would, arguably,

have been required to once again file a proxy statement and once again solicit shareholder

approval of a sale of the same assets, albeit to another buyer (even one that the Debtors believed

would bring more value).  The prior cost to the Company to obtain shareholder approval of the

respective sales transactions to Zippo and to Hawthorne (which were included in a single proxy),

exceeded $270,000.00.  Moreover, that proxy process took approximately eighteen (18) weeks to

complete.

48.    Wells Fargo and the Company, in the exercise of its reasoned business judgment,

determined that it did not make sense for the Company to incur potentially significant additional

costs and delays associated with pursuing another proxy process, without assurances that the

Company would receive the requisite number of shareholders to vote to approve the Sale (as the

Company's bylaws require that at least an excess of 50% of all shareholders vote in connection with a proposed sale of substantially all of the Company's assets).

49.     Instead, prior to the Filing Date, Wells Fargo committed to continue to fund the Company only if the Debtors each filed a Chapter 11 and agreed to pursue an expedited sale process of the Debtors' remaining assets, including those assets used in connection with the aviation business (*i.e.*, the Sale).  As discussed above, Wells Fargo's commitment to fund the DIP Financing Facility is expressly conditioned on the "Sale Transaction Schedule" milestones.

50.     Concerned that the Company would lack adequate resources to continue the operations of the aviation business in the ordinary course without the financial accommodation set forth in the Prepetition Credit Facility, and without being willing to risk that they will secure enough shareholders to vote for a transaction to a new purchaser, the Debtors determined that a Chapter 11 filing for each of the Debtors, with the requisite funding provided by the Post-Petition Financing, was the most adequate means to preserve and maximize the value of the Debtors' assets for the benefit of all stakeholders.  The cost, time-delay and prospect that a sufficient number of shareholders might not cast ballots led the Company to conclude that a 363 sale was a less costly method and more efficient than once again soliciting shareholder approval.

51.     The commencement of these Chapter 11 Cases was, however, not the commencement of a sale process.  As alluded to above, that current sale process has been underway for several months.

52.     Indeed, in the ensuing weeks following SSG's engagement, SSG identified and contacted the top industry constituents who would be in a position to move quickly.[10]  SSG

---

[10]Given that a sale process was previously underway prior to SSG's engagement, as outlined in the Holcomb Affidavit, and as a result of the failure of that sale process to result in (continued…)

contacted ten (10) potential strategic and financial buyers.  Concurrently, management contacted

a significant number of additional potential strategic and financial buyers known to it.  Of those

parties, ten (10) executed confidentiality agreements, received the information memorandum and

gained access to a financial, operational and environmental due diligence managed by SSG and

management.  Thereafter, two (2) potential buyers received management presentations or

conducted facility tours.

53.     After this initial round of marketing and due diligence, the Debtors received five

(5) offers to pursue a sale transaction involving substantially all of Ronson Aviation's assets.

54.     After reviewing these offers, RCLC's Board of Directors directed SSG and

management to initiate an in-depth diligence process and conduct a final round of bidding.

Three (3) acceptable offers were submitted during the final round of bidding, two (2) from

strategic buyers, the other a financial buyer.

55.     Between the initial marketing period and first and final rounds of bidding (and

without regard to the marketing process that occurred in 2009 before the Company determined to

move forward with Hawthorne), interested parties had more than three (3) months to review the

opportunity and conduct due diligence on Ronson Aviation.

56.     After carefully reviewing the final round offers, RCLC's Board of Directors

directed management and SSG to negotiate with and assist these three (3) "final" bidders to

_____

(…continued)

consummated transaction with Hawthorne, SSG immediately began its marketing process to
financial and strategic buyers familiar with Ronson Aviation's assets and operations in order to
quickly identify a potential buyer that could issue a Letter of Intent and minimize further delay in
closing a sale of Ronson Aviation's assets.  Due to the need to quickly identify a potential buyer,
SSG approached the likely candidates that could move to issue a Letter of Intent and work
towards signing a definitive Purchase Agreement.  The decision to engage a limited number of
potential buyer candidates was necessitated by the Debtors' liquidity restrictions, and was
supported by Wells Fargo.

expeditiously secure a fully financed bid and definitively documented sale transaction that maximized the value reasonably obtainable under the circumstances and to continue to work with other bidders who might reasonably be expected to submit a bid in a sale process under Section 363 of the Bankruptcy Code.

57.    After allowing a reasonable time for securing bids that satisfied such criteria and reviewing the status of bids then available for acceptance, RCLC's Board of Directors selected the Purchaser to serve as a stalking horse purchaser of substantially all of Ronson Aviation's assets, subject to the negotiation and execution of an asset purchase agreement.  On or about August 5, 2010, RCLC and Ronson Aviation entered into an exclusive letter of intent (the "LOI"), which was intended to form the basis for the Purchaser's potential stalking horse bid. Under the terms of the LOI, RCLC and Ronson Aviation agreed to sell substantially all of Ronson Aviation's assets to the Purchaser for $9.4 million, subject to certain adjustments and the assumption of certain limited liabilities, including what the Company estimated would be all ordinary course trade obligations of Ronson Aviation and certain accrued obligations to Ronson Aviation's employees.

58.    On August 27, 2010, after extensive negotiation, Ronson Aviation and RCLC entered into a definitive Asset Purchase Agreement (*i.e.*, the Purchase Agreement) with the Purchaser, which Purchase Agreement is consistent with the LOI and, as more particularly described below, provides for, among other things, the sale of substantially all the assets used in the Ronson Aviation business, for a purchase price of $9.4 million, subject to certain adjustments and the assumption of the Assumed Liabilities (as defined in the Purchase Agreement), which include up to $310,000 for "Cure Amounts" and for ordinary course trade obligations of Ronson Aviation and certain accrued obligations to Ronson Aviation's employees (up to $82,000).

46726/0001-6974708v2

## SUMMARY OF THE MATERIAL TERMS OF
## THE PURCHASE AGREEMENT

59.    Pursuant to the terms and subject to the conditions of the Purchase Agreement, the

Debtors, subject to a Court-approved auction and sale process and any higher or better offers in

accordance with bidding procedures to be approved by the Court (the "Sale Process"), will sell to

the Purchaser Ronson Aviation's right, title and interest in and to the Assets and, in connection

therewith, and subject to its agreement with the Purchaser set out in the Purchase Agreement,

assign to the Purchaser the Assumed Aviation Contracts.  The Purchaser will purchase the Assets

(as defined in the Purchase Agreement) free and clear of Encumbrances (as defined in the

Purchase Agreement) pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code.

60.    The terms of the Purchaser's offer to purchase the Assets are set forth in the

Purchase Agreement, and are summarized as follows:[11]

(a)    **Purchaser**.  Trenton Aviation, LLC, a Delaware limited liability
company.

(b)    **Assets**.  In reliance on the representations, warranties, covenants and
agreements contained in the Purchase Agreement and subject to the terms and conditions thereof,
on the Closing Date, Seller shall sell, convey, transfer and deliver to Buyer, and Buyer shall
purchase from Seller, the assets, tangible and intangible, used or to be used in the Aviation
Business, but expressly excluding the Excluded Assets (as defined in Section 1(b)), and
including without limitation, the following (collectively, the "Assets"), free and clear of all
Encumbrances: (i) all assets of the Aviation Business as reflected on Schedule B attached to the
Purchase Agreement including, but not limited to, inventory, tools, equipment, vehicles,
furniture and fixtures; (ii) the right, title and interest of Aviation under the Master Lease,
including leasehold improvements located on the real property leased by Seller under the Master
Lease (the "Real Property"); (iii) the right, title and interest of Aviation under the customer
contracts and contract rights of all kind (including, without limitation, rental contracts, hanger
leases, customer service contracts, tie down agreements, capital leases for equipment, furniture,

---

[11]  The foregoing is only a summary of the Purchase Agreement.  The reader is urged to
consult the Purchase Agreement, a copy of which is attached hereto as Exhibit "A", for a
complete and accurate description of its terms.  Any capitalized terms used but not otherwise
defined in this paragraph 60 shall have the meanings ascribed to them in the Purchase
Agreement.

46726/0001-6974708v2

trucks and other property used in or necessary for the operation of the Aviation Business as currently conducted) listed on Schedule B attached to the Purchase Agreement, to the extent assumable and/or assignable, which Buyer has elected to assume by written notice to Seller within five (5) business days of the date of the Purchase Agreement, which Buyer may extend for an additional five (5) day period, together with all deposits and prepaid amounts under such contracts, agreements and arrangements (collectively "Assumed Aviation Contracts"); (iv) the name "Ronson Aviation" and all other intellectual property rights and other intangible personal property owned or leased by Aviation that is used in or necessary for the conduct of the Aviation Business as currently conducted; (v) FAA certificates and Permits, to the extent assumable and/or assignable; (vi) personnel records of New Hire Employees, and supplier and customer lists; (vii) all of Aviation's goodwill relating to the business of Aviation; and (viii) all right, title and interest of Aviation to claims and causes of action relating to the Assets arising on or after the Closing Date.  With respect to any losses suffered by Buyer with respect to the Assets attributable to any event occurring prior to the Closing, whether or not otherwise indemnified against hereunder, Seller shall assign any rights which Seller might have to pursue or, if such an assignment is or would be invalid or unenforceable as against third parties, shall pursue and assert diligently, in good faith, any and all remedies Seller may have, and Seller shall pay over to Buyer any recovery so obtained.  *See* Purchase Agreement, § 1(a).

 **Excluded Assets**.  Section 1(b) of the Purchase Agreement sets forth the Excluded Assets, which include: (i) all of Seller's right, title and interest in prepaid income Taxes and any claims for refunds with respect to income Taxes paid by Seller for any period ending on or before the Closing Date; (ii) all of Seller's right, title and interest in prepaid insurance or any experience credits, premium deposits or other refunds under insurance policies to the extent the same are refundable; (iii) all right, title and interest of Aviation to claims and causes of action relating to the assets, business or operations of Aviation arising prior to the Closing Date, subject to the obligations of Seller in the last paragraph of Section 1(d) of the Purchase Agreement; (iv) cash on hand and accounts receivable; (v) all Avoidance Actions; provided, that no such Avoidance Actions shall be asserted, brought or otherwise prosecuted by Seller or by any person on Seller's behalf against any (A) critical supplier or vendor set forth on Schedule 1(b)(v) to the Purchase Agreement, or any (B) counterparty to any Assumed Aviation Contract; and (vi) any contract of Seller that is not an Assumed Aviation Contract; and (vii) corporate minute books, stock ledgers and a copy of such financial books and records of Seller necessary to meet the requirements of federal, state and local tax rules and SEC rules.  *See* Purchase Agreement, § 1(b).

 (c) **Assumed Liabilities**.  On the Closing Date, subject to the provisions of Section 1(d) of the Purchase Agreement, Buyer shall assume and agree to pay, perform and discharge the following liabilities and obligations of Seller to the extent that they relate to the Aviation Assets arising on or after the Closing Date (collectively, the "Assumed Liabilities"): (i) all liabilities and obligations relating to the Assets arising on or after the Closing Date; (ii) an amount not to exceed Three Hundred Ten Thousand Dollars ($310,000.00) in the aggregate for: (A) all Cure Amounts under Assumed Aviation Contracts as set forth in and not to exceed the amounts specified on Schedule 1(c)(ii)(A) to the Purchase Agreement, and (B) any ordinary course trade payables of Aviation, as set forth in Schedule 1(c)(ii)(B) to the Purchase Agreement, provided that if the amounts as of Closing for the ordinary course trade payables specified in Schedule 1(c)(ii)(B) the Purchase Agreement and the Cure Amounts specified in Schedule

1(c)(ii)(A) the Purchase Agreement exceed Three Hundred Ten Thousand Dollars ($310,000.00) as of the Closing, the Buyer shall have the right in its sole discretion to determine which ordinary course trade payables it shall assume, in whole or in part, such that the aggregate amount of Buyer's liability shall be equal to Three Hundred Ten Thousand Dollars ($310,000.00); nothing contained in the Purchase Agreement shall create an obligation on the part of Buyer to pay any Cure Amount other than in the amounts set forth on Schedule 1(c)(ii)(A) to the Purchase Agreement, as may be amended as of the Closing, or other amounts with respect to trade payables other than as set forth on Schedule 1(c)(ii)(B) the Purchase Agreement, as may be amended as of the Closing to reflect ordinary course trade payables, and Seller will be responsible for any such amounts which in the aggregate exceed Three Hundred Ten Thousand Dollars ($310,000.00); (iii) Buyer agrees to honor all unused vacation, time-off or sick leave earned and accrued with respect to the New Hire Employees as of the Closing Date and the liabilities referenced in Section 3(b) to be assumed by Buyer, not to exceed, in the aggregate Eighty-Two Thousand Dollars ($82,000.00). *See* Purchase Agreement, § 1(c).

(d)     **Excluded Liabilities**.  Except as provided in the Purchase Agreement, Buyer is not assuming any other of the liabilities or obligations of the Seller, known or unknown, contingent or fixed, which are not expressly assumed by Buyer pursuant to Section 1(c) of the Purchase Agreement, or which were incurred prior to the Closing Date, whether or not shown on the Balance Sheet (as hereafter defined) of Aviation ("Excluded Liabilities").  Without limiting the generality of the foregoing, the Excluded Liabilities will include, and Buyer will not assume or become liable for any liability or obligation relating to or arising out of (i) any breach prior to the Closing of any agreement of Seller relating to the Aviation Business, other than an Assumed Aviation Contract, but limited, however to the Cure Amounts set forth on Schedule 1(c)(ii)(A) to the Purchase Agreement or (B), (ii) the Aviation Business or operation of Aviation or any Asset prior to the Closing, (iii) any Taxes of Seller, including Taxes arising as a result of the operation of the Aviation Business or the ownership of the Assets prior to the Closing or the transactions arising under the Purchase Agreement, (iv) the employment or termination of any employee or former employee of Aviation attributable to any period of time prior to the Closing, including any liability for accrued vacation and holiday pay, and allowances and severance (except to the extent provided in Section 1(c)(iii) to the Purchase Agreement), (v) any litigation, proceeding, claim or investigation by any third party relating to the operation of the Aviation Business or the ownership of the Assets prior to the Closing, whether or not such litigation, proceeding, claim or investigation is pending, threatened or asserted before, on or after the Closing Date,(vi) ISRA Compliance Costs, or (vii) any liability or obligation of Aviation or Parent arising out of or relating to the Ronson Corporation Retirement Plan. *See* Purchase Agreement, § 1(d).

(e)     **Purchase Price**.  The purchase price (the "Purchase Price") for the Assets shall be Nine Million Four Hundred Thousand Dollars ($9,400,000.00) plus the amount, if any, of any payments by Buyer to Seller on account of the Assumed Liabilities set forth in Sections 1(c)(ii) and (iii) of the Purchase Agreement, as adjusted by the amount of any Apportioned Taxes in accordance with Section 6(h)(iv) of the Purchase Agreement.  The Purchase Price shall be delivered by Buyer to Seller as follows: (i) Nine Million One Hundred Thousand Dollars ($9,100,000.00) minus the Bulk Sales Tax Amount delivered at Closing by wire transfer of immediately available federal funds to such bank account(s) as Seller shall have theretofore designated in writing to Buyer (which shall include wire instructions to satisfy the Closing Date Lender Payment, to fund the Remediation Funding Source; (ii) Three Hundred Thousand Dollars

($300,000.00), which has been deposited with the Escrow Agent upon execution of the Purchase Agreement pursuant to Section 2(b), plus such amount as may be identified by the Division of Taxation of the State of New Jersey pursuant to Section 12 (the "Bulk Sales Tax Amount"), which shall be deposited with the Escrow Agent at the Closing, of which Fifty Thousand Dollars ($50,000.00) shall be paid at Closing by wire transfer of immediately available funds by the Escrow Agent to such bank account(s) as Seller shall have theretofore designated in writing to Escrow Agent and the remainder of which shall be distributed pursuant to Section 2(b) and Section 12 of the Purchase Agreement and the Escrow Agreement; and (iii) cash in an amount sufficient to satisfy the Assumed Liabilities set forth in Sections 1(c)(ii) and (iii), delivered at Closing by wire transfer of immediately available federal funds to such bank account(s) as Seller shall have theretofore designated in writing to Buyer.  Subject to the terms and conditions of the Purchase Agreement, on the Closing Date, Seller shall be required to remit to Wells Fargo Bank, National Association ("Wells Fargo" or "Lender") or such other entity(ies) identified in the Sale Order as the entity(ies) entitled to receive such payment, from the proceeds received on account of the Purchase Price, by wire transfer of immediately available funds, an amount necessary to satisfy the remaining obligations of Seller and/or Parent to Wells Fargo pursuant to (A) the Credit and Security Agreement dated as of May 30, 2008 (as amended, modified, supplemented or restated from time to time, including pursuant to the Forbearance Agreement dated as of March 29, 2009 as such Forbearance Agreement has been amended modified, supplemented or restated from time to time, the "Credit Agreement") and (B) the Debtor-in-Possession Credit and Security Agreement dated as of August 19, 2010 (as amended, modified, supplemented or restated from time to time, the "DIP Credit Agreement"), as shall be agreed upon in a payoff letter between the Seller and the Lender not less than one (1) Business Day prior to the Closing (the "Closing Date Lender Payment"), provided, however, that the Closing Date Lender Payment shall be subject to the Twenty-First Amendment to Forbearance Agreement dated August 10, 2010 (the "Twenty-First Amendment") among the Lender and the Obligors (as defined in the Twenty-First Amendment).  *See* Purchase Agreement, § 2(a).

(f)    **Closing Date**.  The closing of the transaction contemplated by the Purchase Agreement (the "Closing") shall take place at Cole, Schotz, Meisel, Forman & Leonard, P.A., Court Plaza North, 25 Main Street, Hackensack, New Jersey, on a date fourteen (14) days after entry of the Sale Order (the "Closing Date") provided that Buyer may extend the Closing Date to a date no later than October 15, 2010.  *See* Purchase Agreement, § 3(a).

(g)    **Representations and Warranties**.  The Purchase Agreement contains representations and warranties of the Debtors in Section 4 and of the Purchaser in Section 5.

(h)    **Covenants**.  Section 6 of the Purchase Agreement sets forth certain covenants and agreements with respect to conduct prior to and after the Closing.

(i)    **Conditions to Closing**.  The Purchase Agreement contains conditions to Closing in Sections 8, 9 and 10.  Section 8 refers to the obligations of each party to close, Section 9 contains the obligations of the Purchaser and Section 10 contains the obligations of the Seller.

(j)    **Termination**.  The Purchase Agreement contains termination provisions in Section 21.

46726/0001-6974708v2

61.     The Debtors seek authority to sell the Assets to the Purchaser on the terms and
conditions set forth in the Purchase Agreement or to a higher or better bidder to be determined in
accordance with the Bidding Procedures.  The Debtors believe that the Sale of the Assets as
proposed will result in a higher price for those assets than a piecemeal liquidation, will result in
the assumption of certain obligations of Ronson Aviation and its estate, including, but not limited
to, most if not all of the ordinary course trade obligations of Ronson Aviation and claims under
the Assumed Aviation Contracts, as well as sufficient proceeds to satisfy the secured claims of
Wells Fargo and Getzler Henrich in full, permit the Debtors to restore the funds to the Custodial
Account (as defined in the Holcomb Affidavit) for the benefit of the creditors of RCLC and
Consumer Products and result in a substantial distribution to unsecured creditors in each of the
Chapter 11 Cases.  Moreover, the Sale will keep the business of Ronson Aviation operational for
the benefit of vendors, customers and employees.  The Debtors further believe that their securing
the Purchaser as a "stalking horse" bidder after several months of extensive marketing efforts,
coupled with the further marketing of the Assets with the assistance of SSG throughout the Sale
Process, and the holding of the Auction, will result in the highest and best price for the Assets.

**RELIEF REQUESTED**

62.     As set forth above, the Debtors are required to obtain approval of the Sale Order
by September 30, 2010.  If the Debtors fail to obtain approval of the Sale Order by September
30, 2010, they will be default under the DIP Financing Facility.  Thus, the Debtors have
determined that given their liquidity and the deadlines imposed by Wells Fargo in connection
with the Sale as set forth in the DIP Financing Facility, a prompt sale of the Assets is the best
way to maximize the value of the Assets for the Debtors' estates and creditors.

63.     Accordingly, by this Motion, the Debtors seek the entry of a Sale Order, subject
to additional competitive bidding pursuant to the Bidding Procedures (*i.e.*, the Sale Process), (i)

26

authorizing the sale of substantially all of Ronson Aviation's assets outside the ordinary course

of business; (ii) authorizing the Sale to the Purchaser or Successful Bidder free and clear of liens,

claims, encumbrances, and interests (*i.e.*, the Encumbrances), pursuant to the Purchase

Agreement; (iii) authorizing the assumption, sale and assignment the Assumed Aviation

Contracts, and (iv) granting related relief.

64.    As set forth below, the Debtors will also seek to disburse a portion of the proceeds

of the Sale to the Debtors' secured creditors, Wells Fargo and Getzler Henrich, and to effectuate

the restoration of the Custodial Account as of the Closing.

**BASIS FOR RELIEF**

65.    In furtherance of the Debtors' duty to maximize the value of their respective

estates, the Debtor has filed the Bidding Procedures Motion seeking approval of the Sale Process

and this Motion, seeking approval of the Sale.

A.    **Necessity for Sale**

66.    Prior to the Filing Date, the Debtors faced severe liquidity constraints imposed as

a result of the defaults under the Prepetition Credit Agreement and exhausted their options for

addressing this issue (including efforts to obtain replacement financing and to otherwise sell

Ronson Aviation's assets outside a bankruptcy proceeding).  Given the prior extensive marketing

of Ronson Aviation's assets and the deadlines imposed by Wells Fargo to sell the Company's

remaining assets, *i.e.*, the Assets proposed to be sold to the Purchaser, as a condition to continued

financing, the Debtors believe a sale of Ronson Aviation's assets as a going concern on the

timetable set forth in the Bidding Procedures Motion is the best way to maximize recoveries to

the Debtors' estates.

67.    The Debtors believe, through the DIP Financing Facility, that they have sufficient

liquidity to conduct the Sale Process (which will maximize the value to their estates).  They do

46726/0001-6974708v2

not believe they can adequately operate beyond the timeframes set forth in the DIP Financing

Facility without further financing (which Wells Fargo has not agreed to provide beyond the dates

set forth in the DIP Financing Facility) and that no purpose would be served by extending the

Sale Process.  Thus, to avoid any potential deterioration of Ronson Aviation's business and its

assets and the possible cessation of Ronson Aviation's business, resulting in the loss of jobs and

value, the Debtors have decided to pursue a sale of all of the Assets on the timetable set forth in

the Bidding Procedures Motion.

## **APPLICABLE AUTHORITY**

68.    "[T]he business judgment rule operates as a presumption 'that directors making a

business decision, not involving self-interest, act on an informed basis, in good faith and in the

honest belief that its actions are in the corporation's best interest.'"  *Continuing Creditors'*

*Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F.Supp.2d 449, 462 (D. Del. 2004) (quoting

*Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988)); *see also Ad Hoc Comm. of Equity Holders of*

*Tectonic Network, Inc. v. Wolford*, 554 F.Supp.2d 538, 555 n.111 (D. Del. 2008).  Thus, this

Court should grant the relief requested in this Motion if the Debtor demonstrates a sound

business justification therefor.  *See In re Delaware Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del.

1991).

69.    The Debtors have sound business justifications for selling the Assets at this time.

As set forth more fully above and in the Holcomb Affidavit, prior to the Filing Date, the Debtors,

acting through their Board, officers and advisors implemented a marketing and sale process for

the Company's assets used in its aviation business designed to reach the strategic and financial

buyers most likely to have an interest in Ronson Aviation's assets and business.  Prior to the

Filing Date, the Debtors and their advisors also devoted substantial resources and energy to

examining ways in which to restructure their obligations to enhance the viability of the business

28

going forward and to enhance the likelihood of a robust sale process. The vigorous search for such interested parties has continued after the Filing Date.

70.     An expedited and targeted postpetition sale process is further justified by exigencies deriving from the Debtors' constrained liquidity. As noted herein and in the Holcomb Affidavit, cash and liquidity for the Debtors' business are very limited. Their ability to draw upon the DIP Financing Facility is contingent upon the pursuit of the Sale Process and meeting the various "Sale Transaction Schedule" milestones, failing which the Debtors run the risk that value of their assets will deteriorate dramatically. There simply is not enough liquidity available to the Debtors for a more protracted sale process than proposed. Thus, the relief sought herein is not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

71.     The Sale Process is designed to provide adequate notice to all potentially interested parties, including those who have previously expressed an interest in purchasing the Assets. Indeed, the Debtors and their professionals have marketed and will continue to market the Assets, and have picked a Stalking Horse Bidder after soliciting the most likely interested competing bidders.

72.     The Bidding Procedures are designed to maximize the value received for the Assets. The process proposed by the Debtors allows for a timely and efficient, albeit expedited, auction process, given the circumstances facing the Debtors, while providing bidders with ample time and information to submit a timely competing bid and to perform due diligence. The Bidding Procedures are designed to ensure that the Assets will be sold for the highest or otherwise best possible purchase price. The Debtors are subjecting the value of the Assets to market testing and permitting prospective purchasers to bid on the Assets. The proposed Sale is

29

a market check through the solicitation of competing bids in a court-supervised Auction pursuant

to the Bidding Procedures.  Accordingly, the Debtors and all parties in interest can be assured

that the consideration received for the Assets will be fair, reasonable and the highest and best

under the circumstances.

**B.      The Debtors Should be Authorized to Sell the Assets Pursuant to Sections 105(a) and 363(b)(1) of the Bankruptcy Code.**

73.      Section 363(b)(1) of the Bankruptcy Code governs sales of assets outside the

ordinary course of business and provides as follows:

> The trustee [or debtor-in-possession], after notice and a hearing,
> may use, sell, or lease, other than in the ordinary course of
> business, property of the estate.

11 U.S.C. § 363(b)(l).[12]  Section 105(a) provides, in relevant part, that "[t]he court may issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this

title."  11 U.S.C. § 105(a).

74.      Although the Bankruptcy Code does not articulate the standard for approving a

sale of assets (other than requiring notice and a hearing), the United States Court of Appeals for

the Third Circuit in the seminal case of *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50

(3d Cir. 1986) interpreted Section 363(b)(i) to require a finding by the Bankruptcy Court that the

acquirer of a debtor's assets be a good faith purchaser.  The Third Circuit construed the "good

faith purchaser" standard to mean one who purchases "in good faith" and for "value."  *Abbotts

Dairies*, 788 F.2d at 147.

75.      The Third Circuit in *Abbotts Dairies* then analogized the bona fides of a Section

363(b)(1) purchaser to a buyer at a judicial sale:

---

[12] Federal Rule of Bankruptcy Procedure 6004 authorizes sales outside of the ordinary
course of business to be conducted privately or by public auction.  Fed. R. Bankr. P. 6004(f)(1).

46726/0001-6974708v2

> The requirement that a purchaser act in good faith … speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

*Abbotts Dairies*, 788 F.2d at 147 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198

(7th Cir. 1978)).  Finally, the Court noted that '[t]raditionally, courts have held that "[f]air and

valuable consideration is given in a bankruptcy sale when the purchaser pays 75% percent of the

appraised value of the assets."  *Abbotts Dairies*, 788 F.2d at 149; *In re Karpe*, 84 B.R. 926, 933

(Bankr. M.D. Pa. 1988).

76.    Respectfully, the sale of the Assets in accordance with the Purchase Agreement

and the Sale Process satisfies the *Abbotts Dairies* test.  First, the Debtors have fully disclosed and

requested the Court's approval of the Bidding Procedures and all the terms and conditions of the

Sale Process, including the proposed Auction, and have and continue to provide comprehensive

notice of the Sale.  *See In re Colony Hill Assoc.*, 111 F.3d 269 (2d Cir. 1997) (determination of

"good faith" is based on traditional equitable principles, including whether there has been full

disclosure to the Bankruptcy Court).  In addition, the Debtors, on their own initially and then

through SSG, extensively marketed the sale of the Assets for nearly several months.  In fact, the

potential sale of Ronson Aviation's business has been well known to investors and strategic

purchasers in the industry for more than one year.  In conjunction with these widespread and

comprehensive marketing efforts, the Purchase Agreement was ardently negotiated by the

Debtors and SSG (with input from Wells Fargo), and the Debtors believe that the Purchase Price

and other consideration being provided under the Purchase Agreement such as, for example, the

assumption of the Assumed Liabilities, represent reasonably equivalent value and fair

consideration for the Assets.  Lastly, the Debtors are hopeful that as a result of their intended

31

notice of the Sale to all bidders who previously expressed an interest in the Assets (and to a broad spectrum of potential purchasers), interested purchasers will be encouraged to submit bids, attend the Auction and generate a spirited bidding process.

77.    In addition to the *Abbotts Dairies* requirements, which the Debtors clearly satisfy, courts typically require a sound business purpose to sell assets outside of a plan of reorganization. *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *In re Conroe Forge & Mfg. Corp.*, 82 B.R. 781, 783-86 (Bankr. W.D. Pa. 1988); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).  Courts consider the following non-exhaustive list of factors in determining whether a sound business purpose exists: (a) sound business reason for the sale; (b) accurate and reasonable notice; (c) proportionate value of the asset to the estate as a whole (fair and reasonable); (d) the amount of elapsed time since the filing; (e) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (f) the effect of the proposed disposition on the future plan; (g) the amount of proceeds to be obtained from the sale versus the appraised value of the property sold; and (h) whether the asset is decreasing or increasing in value.  *Lionel*, 722 F.2d at 1071; *Delaware & Hudson Ry.*, 124 B.R. at 176; *In re Weatherly Frozen Food Group, Inc.*, 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992).  A debtor's showing of sound business justification need not be unduly exhaustive.  Rather, a debtor is "simply required to justify the proposed disposition with sound business reason." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

46726/0001-6974708v2

78.     Consideration of the above factors here unequivocally establishes that the sale should be approved.  As discussed above, the Debtors, commenced marketing the Assets (originally in March 2009) and then upon the failure of the transaction with Hawthorne, since at least early May 2010.  The Debtors have had the assistance of SSG since mid-May 2010.  The Debtors, with the assistance of SSG, have and will continue to aggressively solicit proposals for the purchase of the Assets before the proposed Bid Deadline and, based on the Debtors' extensive marketing efforts, the Debtors will have amply marketed the Assets before the Sale Approval Hearing.  As set forth in the Bidding Procedures Motion, the Debtors have proposed Bidding Procedures that are designed to maximize the purchase price for the Assets and to minimize the incurrence of unnecessary costs and risks.  Those Bidding Procedures and the form and manner of notice of the Sale have been approved by the Court and will ensure that any and all interested parties will receive adequate notice of the Auction to allow for a competitive sale process.  The Sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to receive the highest or otherwise best value for the Assets.  Therefore, the fairness and reasonableness of the consideration to be received will be demonstrated by a "market check" through the Auction and the Sale Process.

79.     Absent the Sale, whether to the Purchaser or another Successful Bidder, Ronson Aviation faces the prospect of being forced to cease operations.  Certainly, absent the Sale, the Debtors will default under the DIP Financing Facility.  As a result, the Debtors will lack sufficient cash resources to continue to operate the Ronson Aviation business and pay their debts as they are due, including those required to satisfy Ronson Aviation's obligations under the Master Lease, and the Assets will precipitously decline in value.  Thus, the relief sought herein is

not only reasonable, but necessary, to maximize the value of the Debtors' estates for the benefit of their stakeholders.

80.    As the *Lionel* court's discussion of section 363(b) makes clear, the quintessential "good business reason" on which reorganization courts have historically justified the sale of a debtor's property prior to a plan is when any delay in the sale of the property threatens to erode significantly the value of that property. *Lionel*, 722 F.2d at 1066-69; *see also In re V. Loewer's Gambrinus Brewery Co.*, 141 F.2d 747, 749 (2nd Cir. 1944). As the *Lionel* court stated, "[i]n such cases … the bankruptcy machinery should not straightjacket the bankruptcy judge so as to prevent him from doing what is best for the estate." *Lionel*, 722 F.2d at 1069.

81.    Thus, courts applying section 363(b) have routinely authorized the sale of a debtor's operating assets in advance of the plan process where the debtor did not have sufficient liquidity to continue operating, and the cessation of operations was likely or certain to result in the debtor's inability to realize the going concern value of its business.[13]

---

[13] *See, e.g., Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (approving sale of radio station where debtor lacked funds to continue operations and could lose broadcast license if station went off the air); *In re Brookfield Clothes, Inc.,* 31 B.R. 978 (S.D.N.Y. 1983) (approving sale of clothing manufacturer that had shut down due to lack of cash prior to petition date); *In re Lady H Coal Co., Inc.,* 193 B.R. 233, 244 (Bankr. S.D. W.Va. 1996) (approving sale of coal producer that could not fund operations and was nearly out of cash needed to operate pumps that prevented mines from flooding); *In re WBQ P'ship,* 189 B.R. 97, 102-03 (Bankr. E.D. Va. 1995) (approving sale of nursing homes as necessary to protect going concern value); *In re Weatherly Frozen Food Group, Inc.,* 149 B.R. 480, 483 (Bankr. N.D. Ohio 1992) (approving sale of ice cream producer that lacked cash needed to perform maintenance necessary to continue operations); *In re Titusville Country Club,* 128 B.R. 396, 400 (Bankr. W.D. Pa. 1991) (approving sale of golf course at start of golf season where debtor had inadequate funds to maintain course for the season); *In re Channel One Comm., Inc.,* 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (approving sale of radio station because of lack of funds needed to continue to operate); *In re Naron & Wagner, Chartered*, 88 B.R. at 90 (Bankr. D. Md. 1988) (approving sale of computer business where debtor was unable to continue operations due to lack of liquidity); *In re Condere Corp.*, 228 B.R. 615, 629 (Bankr. S.D. Miss. 1998) (approving sale of tire plant that needed major capital infusion to reach necessary production levels); *In re Boogaart of Fla., Inc.,* (continued…)

82.     Time is of the essence in these Chapter 11 Cases for a number of reasons.  First,

the DIP Financing Facility provides that it will be a "Termination Event" if the Debtors fail to

consummate the transactions contemplated in this Motion on the schedule set forth herein, which

schedule takes into account the Debtors need for continued funding and the unlikelihood of

increasing the Purchase Price if the Sale Process were extended.

83.     Moreover, the Debtors are operating with very limited resources.  As such, the

Sale must be approved on the expedited schedule set forth herein, in order to ensure that the

Debtors will have access to the sale proceeds as soon as possible.  Given these time constraints,

the Debtors have determined that the schedule set forth in this Motion (and in the Bidding

Procedures Motion) is necessary and appropriate.

84.     For all these reasons, the Debtors respectfully submit that the sale of the Assets is

supported by sound business reasons and is in the best interests of the Debtors and their estates.

Accordingly, the Debtors request approval of the sale to the Purchaser, or the Successful Bidder,

pursuant to Section 363(b) of the Bankruptcy Code.

## The Sale Will Not Require the Appointment of a Consumer Privacy Ombudsman

85.     The Sale of the Assets will not necessitate the appointment of a consumer privacy

ombudsman in accordance with Section 332 of the Bankruptcy Code.  Section 363(b)(l) of the

Bankruptcy Code provides that:

> if the debtor in connection with offering a product or a service
> discloses to an individual a policy prohibiting the transfer of
> personally identifiable information about individuals to persons
> that are not affiliated with the debtor and if such policy is in effect
> on the date of the commencement of the case, then the trustee may

---

(…continued)
17 B.R. 480, 483 (Bankr. S.D. Fla. 1981) (approving liquidation of grocer operating at a
continual loss).

46726/0001-6974708v2

> not sell or lease personally identifiable information to any person
> unless … such sale or such lease is consistent with such policy.

11 U.S.C. § 363(b)(l).

86.    Section 101(41A) defines "personally identifiable information" as an individual's name, residence address, email address, telephone number, social security number or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual." 11 U.S.C. § 10l(41A).

87.    The Debtors are not transferring "personally identifiable information" to the Purchaser (or any Successful Bidder for that matter).

88.    Even to the extent that the information collected from Ronson Aviation's customers includes "personally identifiable information" as that term is defined in Section 101(41A), the buyer of the Assets will serve as a successor-in-interest to Ronson Aviation's privacy policy and utilize the "personally identifiable information" in exactly the same fashion as Ronson Aviation.  Accordingly, this Court may authorize the proposed Sale without appointing a privacy ombudsman because the transfer of the "personally identifiable information" is consistent with Ronson Aviation's privacy policy as provided in 11 U.S.C. § 363(b)(l).

**C.    The Debtors Should Be Authorized to Sell the Assets Free and Clear of Liens, Claims, Encumbrances, and Interests Pursuant to Section 363(f) of the Bankruptcy Code**

89.    The Bankruptcy Code authorizes a debtor-in-possession to sell property of the estate under Section 363(b) free and clear of any interest or lien in such property if one of the following five criteria is met:

> (1)    applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;

36

46726/0001-6974708v2

    (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

    (4)     such interest is in bona fide dispute; *or*

    (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f) (emphasis added).

90.     This statute authorizes the sale of assets "free and clear of any interest." The term "any interest," as used in Section 363(f), is not defined in the Bankruptcy Code. The Third Circuit Court of Appeals specifically addressed the scope of the term "any interest" in *Folger Adam Security v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258 (3d Cir. 2000). The Third Circuit observed that while some courts have "narrowly interpreted that phrase to mean only *in rem* interests in property," the trend in modern cases is towards a "broader interpretation which includes other obligations that may flow from ownership of the property." *Id.* at 258. In turn, the *Folger Adam* Court cited with approval the Fourth Circuit's ruling in *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 581-82 (4th Cir. 1996) for the proposition that debtors "could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

91.     The language of Section 363(f) is in the disjunctive, so that a sale free and clear of interests can be approved if any one of the enumerated conditions is satisfied. *In re Heine*, 141 B.R. 185, 189 (Bankr. D.S.D. 1992); *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

92.     As made clear by the statute, under Section 363(f)(2), a bankruptcy debtor may sell estate property free and clear of interests where the interest holders consent to such a sale. 11 U.S.C. § 363(f)(2). The requisite consent may either be express or implied from the circumstances surrounding the sale.

93. Here, the Sale of the Assets free and clear of liens, claims, encumbrances, and interests, except with respect to any "claims" that constitute Assumed Liabilities under the Purchase Agreement or otherwise are expressly assumed by the Purchaser in the Purchase Agreement, should be approved under Section 363(f)(2) of the Bankruptcy Code by virtue of the express consent of Wells Fargo and Getzler Henrich to the Sale (each of which consents to the Sale provided that the proceeds of the Sale are disbursed as provided below so as to result in the satisfaction of each of their claims in full).

94. To the extent that any other creditor with an interest in the Assets receives notice of the Sale and does not file an objection, such creditor should be deemed to have implicitly consented to the contemplated transactions. *See Veltman v. Whetzal*, 93 F.3d 517 (8th Cir. 1996) (failure to object to proposed sale, coupled with agreement to stipulate regarding authority to sell free of interest, constituted consent to the sale free and clear of interests); *Hargrove v. Pemberton (In re Tabore, Inc.)*, 175 B.R. 855 (Bankr. D.N.J. 1994) (failure to object to notice of sale or attend hearing deemed consent to sale for purposes of § 363); *In re Shary*, 152 B.R. 724 (Bankr. N.D. Ohio 1993) (failure to object to transfer of liquor license issued by state constituted consent to sale). Therefore, either expressly or implicitly, the requirements of Section 363(f)(2) for the Sale or transfer of the Assets free and clear of interests, including the Encumbrances, will be satisfied.

95. Moreover, to the extent any other party asserting an interest in or lien upon the Assets objects, the Debtors submit that they can establish the propriety of the Sale under Section 363(f)(3) because the Purchase Price will no doubt exceed any purported lien and, thus, the Assets will be sold at a price which is "greater than the aggregate value of all liens on such [Assets]." *See* 11 U.S.C. § 363(f)(3).

96.     Indeed, all liens on or interests in the Assets will be satisfied or will attach to the

proceeds of the Sale with the same force, effect and priority as such liens have on the Assets,

subject to the rights, claims and defenses, if any, of the Committee as set forth in the Final DIP

Order.  Accordingly, the Debtors submit that the Sale of the Assets free and clear of all

Encumbrances (within the meaning and as contemplated by the Purchase Agreement) satisfies

the statutory prerequisites of § 363(f) of the Bankruptcy Code.

97.     Thus, the Sale should be free and clear of such Encumbrances.  Additionally, the

Debtors submit that authorizing Ronson Aviation to sell the Assets free and clear of "successor

liability" type claims also is justified under *Folger Adam* and *Leckie*.

**D.     Good Faith Under Section 363(m) of the Bankruptcy Code; Sale Not In
         Violation of Section 363(n) of the Bankruptcy Code**

98.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(n) of the Bankruptcy Code, among other things, provides that a

trustee may avoid a sale under such section if the sale price was controlled by an agreement

among potential bidders at the sale.  As discussed above, the Third Circuit in *Abbotts Dairies*

noted the kind of misconduct that would destroy a buyer's good faith.  *Abbotts Dairies*, 788 F.2d

at 147.

99.     Here, the Purchase Agreement represents a zealously negotiated, arms'-length

transaction, in which the Purchaser has acted in good faith, without collusion or fraud of any

kind.  In addition, substantially all aspects of the negotiations, including the outstanding issues

that the parties were trying to resolve at various stages of their negotiations, also were discussed

with Wells Fargo.  Therefore, the Debtors respectfully request that the Court find that the

Purchaser has purchased the Assets in good faith within the meaning of Section 363(m) of the

Bankruptcy Code, and is entitled to the protections of Sections 363(m) and 363(n) of the

Bankruptcy Code.  If a party other than the Purchaser emerges as the Successful Bidder, the

Debtor intends to make the appropriate showing at the Sale Approval Hearing that such

Successful Bidder satisfies the requirements of "good faith" and similarly is entitled to relief

under Sections 363(m) and 363(n).

**E.**    **The Debtors Should be Authorized to Effectuate the Restoration of the Custodial Account and Disburse the Net Proceeds of the Sale to or on Account of the Obligations of Wells Fargo and Getzler Henrich**

100.    The net proceeds of the Sale (the "Sale Proceeds") are estimated to be

approximately $8.9 million, subject to certain adjustments at the time of the Closing (with

respect to Apportioned Taxes).  The Court should authorize the Debtors to disburse the Sale

Proceeds to or on account of the obligations of Wells Fargo and Getzler Henrich.[14]

101.    The Sale Proceeds are proceeds from the sale of the Collateral (as defined in the

Final DIP Order).  Wells Fargo's and Getzler Henrich's respective security interests in the

Collateral would transfer and attach to the Sale Proceeds in the same priority as they each had

held in the Collateral.  Allowing the Debtors to satisfy these obligations (whether directly or

indirectly through the means of the Getzler Henrich Fee Agreement) will result in the liens

---

[14] Pursuant to the terms of the Getzler Henrich Fee Agreement, Wells Fargo is to immediately prior to the Closing of the Sale pay to Getzler Henrich the amounts due to Getzler Henrich thereunder, with such amounts added to the amount owed to Wells Fargo under the DIP Credit Agreement (as defined under the Final DIP Order) and repaid to Wells Fargo from the Sale Proceeds.

46726/0001-6974708v2

thereon being released and cash, free of any liens, available for distribution consistent with a liquidating plan.

102.    Delays in paying the Sale Proceeds to Wells Fargo and Getzler Henrich will reduce the overall amount available for other creditors since interest continues to accrue on the Prepetition Obligations and the DIP Obligations (each as defined in the Final DIP Order). Further, under the DIP Financing Facility, the Debtors must continue to make adequate protection payments to Wells Fargo. There is no just reason for the Debtors to delay disbursing the Sale Proceeds to Wells Fargo and Getzler Henrich.

103.    Accordingly, the Debtors submit that the disbursement of the Sale Proceeds to or on account of the claims of Wells Fargo and Getzler Henrich is in the best interest of the Debtors' bankruptcy estates. By satisfying these secured claims and eliminating the interest accrual thereon, the general unsecured creditors increase their ability to secure a recovery. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999) (one of the main purposes of Chapter 11 is to maximize recovery for unsecured creditors). The Court should therefore authorize the disbursement of the Sale Proceeds to Wells Fargo (and indirectly to Getzler Henrich) contemporaneously with the Closing in an amount to fully satisfy their respective claims.

104.    The Debtors also seek approval to implement the restoration of the Custodial Account, consistent with the Twenty-First Forbearance Amendment. As described in the Holcomb Affidavit, at the time of the Zippo closing, Wells Fargo agreed that upon the closing of a sale of Ronson Aviation, it would refund the Custodial Funds to RCLC and Consumer Products

for distribution to their creditors (provided there were sufficient funds from a Ronson Aviation

transaction to do so).[15]

105.    The Twenty-First Forbearance Amendment provides, in relevant, as follows:

(a)    The amount to be restored to the Custodial Account (as defined in the 13th Amendment) by Lender shall be in an amount equal to the lesser of (i) $2,527,556.71, and (ii) that portion of the proceeds of sale of [Ronson Aviation]'s assets (the "RAI Sale") in excess of the amount of the then outstanding Indebtedness due and owing by Obligors immediately prior to the closing of the RAI Sale and attributable to [Ronson Aviation] (such amount being referred to as the "Restored Custodial Funds");

(b)    Immediately prior to the closing of the RAI Sale, Lender shall make an Advance to [Consumer Products] (the "RCPC Advance") directly into the Custodial Account in an amount equal to the amount of the Restored Custodial Funds;

(c)    The payoff amount to be received by Lender upon the closing of the RAI Sale shall be the total amount of the then outstanding Indebtedness due and owing by Obligors on such date (which for purposes of clarity shall include the amount of the RCPC Advance, plus all other amounts due and owing to Lender by Obligors upon the closing of the RAI Sale) (the "Payoff Amount");

(d)    Upon receipt by Lender of the Payoff Amount, Lender shall apply the Payoff Amount to the repayment in full of all Indebtedness due and owing to Lender by the Obligors (including the amount of the RCPC Advance);  and

(e)    The Restored Custodial Funds shall be returned to [RCLC] and [Consumer Products] immediately after the receipt by Lender of the Payoff Amount, subject to payment of any ordinary and

---

[15] As more particularly described in the Holcomb Affidavit, the Custodial Funds represent the net sale proceeds that exceed the allocable share of the indebtedness under the Prepetition Credit Agreement based upon actual advances and use by the subsidiary borrowers upon the closing of the sale of the aviation business assets.  The purpose of the agreement among the Company and Wells Fargo to turn over (and then restore) the Custodial Funds avoids having the unsecured creditors of the Consumer Products Sellers (as defined in the Holcomb Affidavit) unfairly saddled with payment of a disproportionate share of the Wells Fargo indebtedness merely because the Consumer Products Sellers' assets were sold first.

46726/0001-6974708v2

customary fees and expenses associated with maintaining the
Custodial Account, upon request and in accordance with
instructions provided to Lender by Obligors consistent with this
Amendment.

106.    Accordingly, upon the approval of the Sale, the Debtors will amend the DIP

Financing Facility, to permit the implementation of the restoration of the funds to the Custodial

Account, including an "Advance" to Consumer Products in an amount up to $2,527,556.71, with

such funds to be available for the creditors of RCLC and Consumer Products.  Permitting the

restoration of the Custodial Account effectuates the intent of the parties to distribute the proceeds

from the respective sales of the Company's operating subsidiaries to the creditors of those

"estates".

## F.    The Debtors Should Be Authorized to Assume and Assign the Assumed Aviation Contracts

107.    The Purchase Agreement requires Ronson Aviation to assume and assign the

Assumed Aviation Contracts to the Purchaser upon the Closing.

108.    Section 365 of the Bankruptcy Code authorizes a debtor-in-possession to assume

any executory contract or unexpired lease, subject to Court approval.  11 U.S.C. § 365(a).  The

requirements for assumption of executory contracts and unexpired leases, if there has been a

default thereunder, are set forth in Section 365(b)(1):

(b)(1) If there has been a default in an executory contract or
unexpired lease of the debtor, the trustee [debtor-in-possession]
may not assume such contract or lease unless, at the time of
assumption of such contract or leases, the trustee -

(A)    cures, or provides adequate assurance that the
trustee will promptly cure, such default …;

(B)    compensates, or provides adequate assurance that
the trustee will promptly compensate, a party other than the debtor
to such contract or lease, for any actual pecuniary loss to such
party resulting from such default; and

> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b).

109.    In turn, a debtor-in-possession may assign an executory contract or unexpired lease if: (i) it assumes the contract in accordance with the provisions of Section 365(b) of the Bankruptcy Code; and (ii) adequate assurance of future performance by the assignee is provided. 11 U.S.C. § 365(f)(2).  The Bankruptcy Code does not define the meaning of "adequate assurance of future performance."  Courts have held that adequate assurance of future performance depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

110.    In addition, Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign executory contracts and unexpired leases free from anti-assignment restrictions.  Section 365(f)(1) renders unenforceable provisions that prohibit, restrict or condition an assignment of an executory contract or unexpired lease.  Section 365(f)(3) prohibits the termination or modification of an executory contract or unexpired lease because of the assumption or assignment of such contract or lease.

111.    Here, the assumption and assignment of the Assumed Aviation Contracts is a necessary part of the Purchase Agreement, and Ronson Aviation satisfies all of the relevant requirements of Section 365 of the Bankruptcy Code.  First, pursuant to Section 1(c) of the Purchase Agreement, cure amounts required to be paid to the counterparties to the Assumed Aviation Contracts will be assumed and/or paid.  As reflected in the Bidding Procedures Order,

44

46726/0001-6974708v2

the counterparties to the Assumed Aviation Contracts will have an opportunity to review and

object to the Debtors' cure statement (the "Cure Statement"), which reflects the amounts the

Debtors believe are due and owing to the non-debtor parties as of the Filing Date and, which

Cure Statement will be filed with the Court and served on the counter-parties consistent with the

Bidding Procedures Order.  In the event any potential disputes to the Cure Statement cannot be

resolved consensually, the Court will adjudicate the dispute and there will be sufficient funds to

pay those amounts pending Court Order.

112.    Second, the Purchaser or Successful Bidder will demonstrate at the Sale Approval

Hearing adequate assurance of future performance under the Assumed Aviation Contracts.

Accordingly, given the requirements of Section 365 of the Bankruptcy Code are satisfied,

Ronson Aviation should be authorized to assume and assign the Assumed Aviation Contracts to

the Purchaser or a Successful Bidder.

**G.      The Debtor Should Be Authorized to Reject the Rejected Contracts**

113.    In the event the Debtors deem it appropriate at the conclusion of the Auction, the

Debtors reserve the right to request authority at the Sale Approval Hearing to reject any

executory contracts or unexpired leases that are not Assumed Aviation Contracts (the "Rejection-

Subject Contracts") pursuant to Section 365 of the Bankruptcy Code.

114.    Section 365(a) of the Bankruptcy Code allows the debtor to reject any executory

contract or unexpired lease if such rejection represents a reasonable exercise of its business

judgment.  *See In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2d Cir. 1993); *In re Bullet Jet

Charter, Inc.*, 177 B.R. 593, 601 (Bankr. N.D. Ill. 1995); *In re Del Grosso*, 115 B.R. 136, 138

(Bankr. N.D. Ill. 1990); *Johnson v. Fairco Corp.*, 61 B.R. 317, 319-20 (N.D. Ill. 1986).

45

115.     After conducting the Auction, any unsold Assumed Aviation Contracts are likely valueless to the Debtors and might only create a potential administrative expense burden on the Debtors' estate.

116.     Therefore, the Debtors request authority, upon notice to counterparties to the Rejection-Subject Contracts, to reject, as of the date of the Sale Approval Hearing, some or all of their unsold Assumed Aviation Contracts that the Debtors believe will have no value to the estates.

**H.     The Break-Up Fee is Necessary to Preserve the Value of the Debtors' Estates and Return Maximum Value to Stakeholders**

117.     Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction.  The Debtors believe that in bringing forward the Purchaser and negotiating the Purchase Agreement as the stalking horse offer and thereby facilitating possible competitive bidding and an Auction (as defined in the Bidding Procedures Order) will maximize the realizable value of the Assets for the benefit of the Debtors' estates, creditors and other parties-in-interest.  Consistent with the Purchase Agreement and in light of the benefit which will be obtained by the estate by reason of the Purchaser's offer of the Purchase Agreement, if the Purchaser ultimately is not the Successful Bidder and there is an Alternate Transaction or a Willful Seller Termination (as those terms are defined in the Purchase Agreement), the Purchaser should be awarded the Break-Up Fee (as defined below).

118.     In order to provide an incentive and to compensate the Stalking Horse Bidder for entering into the Purchase Agreement, the Debtors have agreed to pay the Stalking Horse Bidder a break-up fee in the amount of $200,000 (the "Break-Up Fee") in the event of an Alternate Transaction or a Willful Seller Termination subject, of course, to the approval of the Court.

46726/0001-6974708v2

119.    The Debtors believe that the Purchaser's stalking horse offer and the Purchase

Agreement will benefit the Debtors' estate by establishing a sale value floor and promoting more

competitive bidding.  The award of the Break-Up Fee will be fair compensation to the Purchaser

for the value it has brought to the estates.  Without the Debtors' commitment to support the

award of the Break-Up Fee as requested herein, the Purchaser would not have agreed to enter

into the Purchase Agreement.  Without the Purchaser's stalking horse offer, the prospect of

competitive bidding on the Debtors' Assets would be reduced.  The availability of the Break-Up

Fee, therefore, is necessary in order to provide the Purchaser with some assurance that it will be

compensated for the value that it will have enabled the Debtors to realize and it recognizes the

risk that the Sale process and bidding procedures present for the Purchaser.

120.    Break-up and other termination fees are a normal, and in many cases necessary,

component of sales outside the ordinary course of business under section 363 of the Bankruptcy

Code.  *See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc.*

*(In re Integrated Resources, Inc.)*, 147 B.R. 650 (S.D.N.Y. 1992) (noting that break-up fees may

be legitimately necessary to convince a single "white knight" to enter the bidding by providing

some form of compensation for the risk it is undertaking); *In re Fin. News Network, Inc.*, 126

B.R. 152 (S.D.N.Y. 1991), *appeal dismissed*, 931 F.2d 217 (2d Cir. 1991); *In re Crowthers*

*McCall Pattern, Inc.*, 114 B.R. 877, 879 (Bankr. S.D.N.Y. 1990) (break-up fees in merger

agreement approved); *In re 995 Fifth Ave. Assoc., L.P.*, 96 B.R. 24, 28-29 (Bankr. S.D.N.Y.

1989) (payment of $500,000 break-up fee to outbid contract vendee following sale of debtor's

property was not unreasonable absent evidence that fee chilled bidding).  Bankruptcy Courts

regularly authorize break-up and other termination fees under the "business judgment rule"

which, as noted above, essentially prohibits judicial second-guessing of the actions of a

corporation's board of directors taken in good faith and in the exercise of sound business judgment.  *See id.*

121.    The United States Court of Appeals for the Third Circuit established standards for determining the appropriateness of expense reimbursement and other financial protections in the bankruptcy context in *Calpine Corp. v. O'Brien Envtl Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999).  In *O'Brien*, the Third Circuit identified at least two instances in which an award of a break-up fee or expense reimbursement may benefit the estate.  First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *O'Brien*, 181 F.3d at 537.  Second, if the availability of break-up fees and expenses were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  *Id.*  The Third Circuit held that although payment of expenses and break-up fees are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions in section 503(b) of the Bankruptcy Code govern in the bankruptcy context.  Therefore, to be approved, the debtor must demonstrate that the expenses to be reimbursed provide a benefit to its estate.  *Id.* at 533.

122.    In *O'Brien*, the court reviewed the nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee.  Such factors are:

> (i)    the presence of self-dealing or manipulation in negotiating the break-up fee;
>
> (ii)    whether the fee harms, rather than encourages, bidding;

48

(iii)    the reasonableness of the break-up fee relative to the purchase price;

(iv)    whether the unsuccessful bidder placed the estate property in a "sales configuration, mode" to attract other bidders to the auction;

(v)    the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

(vi)    the correlation of the fee to a maximum of value of the debtor's estate;

(vii)    the support of the principal secured creditors and creditors committees of the break-up fee;

(viii)    the benefits of the safeguards to the debtor's estate; and

(ix)    the substantial adverse impact of the break-up on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See O'Brien*, 181 F.3d at 536.

123.    The Break-Up Fee will enable the Debtors to secure an adequate sale price floor for the Assets and, thus, insist that competing bids be materially higher or otherwise better than the Purchase Agreement – a clear benefit to the Debtors' estates.  Moreover, the Purchaser would not agree to act as a stalking horse without the Debtors' commitment to pursue approval of the Break-Up Fee.  Without this commitment, the Debtors would have lost the opportunity to test the stalking horse offer for the Assets in the marketplace, and would have lost the downside protection afforded by the existence of the Purchaser and the Purchase Agreement.  Furthermore, without the benefit of the stalking horse bid, the bids received at Auction for the Assets, if any, could be substantially lower than that offered by the Purchaser.

124.    In the present case, the Break-Up Fee approximates 2% of the value of the Stalking Horse Bidder's bid.  This percentage is of the same order of magnitude as break-up fees approved in other cases.  *See, e.g., Consumer News & Business Channel P'ship v. Fin. News Network, Inc. (In re Fin. News Network, Inc.)*, 980 F.2d 165, 167 (2d Cir. 1992) (noting without discussion $8.2 million Break-up fee on $149.3 million transaction, or 5.5% of consideration

offered, is fair); *Cottle v. Stores Comm'ns*, 849 F.2d 570, 578-79 (11th Cir. 1988) (approving

$29 million fee on $2.5 billion transaction, or 1.16%); *see also LTV Aerospace & Defense Co. v.*

*Thomson-CSF, S.A. (In re Chateugay Corp.)*, 1998 B.R. 848, 861 (S.D.N.Y. 1996) (enforcing

$20 million "reverse Break-up fee" payable to debtor on $450 million offer, or 4.4% of the

consideration).  The prospect of the protection offered by a Break-Up Fee induced the

Purchaser's substantial and valued bid in advance of the sale procedures and any Auction made

the Purchase Agreement possible; the Purchase Agreement establishes a committed baseline, or

asset value floor, upon which any other bids can be compared and evaluated, and therefore, is

beneficial to the Debtors' estates and their stakeholders.

125.    The Debtors respectfully submit that the proposed Break-Up Fee will not be

found to have chilled bidding and is fair and reasonable under the circumstances and, therefore,

meets the requirements of the business judgment rule, as well as the Third Circuit's standards as

set out in *O'Brien*.

## I.    **Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

126.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property … is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order

authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the

expiration of 14 days after the entry of the order, unless the court orders otherwise."

127.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient

time for an objecting party to appeal before an order can be implemented.  *See* Advisory

Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules

6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should

"order otherwise" and eliminate or reduce the stay period, the leading Bankruptcy treatise

suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  10 COLLIERS ON BANKRUPTCY 15TH ED. REV., ¶ 6004.10 at 6004-18 (L. King, 15th rev. ed. 2008).  The treatise further provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

128.    As described above, time is clearly of the essence.  With the failure to meet the "Sale Transaction Schedule" milestones, and the resulting threat of liquidation, means that the Debtors' assets and business are at significant risk of losing value if the Purchase Agreement is not promptly approved or if a prompt closing of the Sale cannot be accomplished.  A prompt closing of the Sale is therefore of critical importance and the Debtors request that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

WHEREFORE, the Debtors respectfully request that the Court enter a Sale Order subject to the result of the Auction and to the Bidding Procedures (i) approving and authorizing the Sale; (ii) authorizing the assumption and assignment of the Assumed Aviation Contracts; (iii) authorizing the termination or rejection of the Rejection-Subject Contracts; and (iv) granting such other and further relief as may be just and proper, including the partial disbursement of the Sale Proceeds as set forth herein.

DATED:  September 9, 2010

Respectfully submitted,
COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Proposed Attorneys for RCLC, Inc., *et al.*,
Debtors-in-Possession

By:    */s/ David M. Bass*
Michael D. Sirota
David M. Bass

## **VERIFICATION**

DARYL K. HOLCOMB, of full age, certifies as follows:

1.     I am the Chief Financial Officer, Vice President and Control of RCLC, Inc. and

each of the above-captioned Debtors and Debtors-in-possession (collectively, the "Debtors").  As

such, I have full knowledge of the facts set forth in, and am duly authorized to make this Verified

Application on the Debtors' behalf.

2.     I have read the foregoing Verified Application and certify that the statements

contained therein are true based upon my personal knowledge, information and belief.

3.     I am aware that if any of the factual statements contained in the Verified

Application are willfully false, I am subject to punishment.


DATED: September 9, 2010                    ___/s/ Daryl K. Holcomb_____
                                                  DARYL K. HOLCOMB

46726/0001-6974708v2